DAVID N. FOX, Appellee, v. CHICAGO, ST. PAUL & KANSAS CITY RAILWAY COMPANY, Appellant.

1. **Railroads:** EMPLOYMENT OF BRAKEMEN: AUTHORITY OF CONDUCTOR. Where a brakeman, employed on a train having but one brakeman and an assistant, temporarily left his work, and the train was run with the assistance of the rest of the crew to the other end of the line, where the conductor employed a man to take his place, *held*, that the emergency was such as to authorize the employment, and that for the time being the person so employed was an employee of the conductor's principal.

2. **Master and Servant:** NEGLIGENCE: PERSONAL INJURY: CONTRIBUTORY NEGLIGENCE. Where in an action by a brakeman to recover for injuries sustained in the performance of his duty, the plaintiff complained that he was required to catch a car when running at a dangerous rate of speed, that the lantern furnished him was so defective that its light was blown out by the wind, so that he was unable to see, and for these reasons, and because the ground was rough and uneven at the track, his foot slipped, and was run over, while attempting to climb upon the car to set the brakes, *held*, that while the plaintiff might have refused, under the circumstances, to mount the car, yet as he was acting under orders, and in an emergency which afforded no time for reflection, he was not chargeable with contributory negligence.

3. ———: ———: EVIDENCE. The conductor having testified that he did not employ the plaintiff, *held*, that evidence that he gave the plaintiff twenty-five cents with which to procure his breakfast was properly admitted.

4. ———: ———: DAMAGES: PLEADING. Under an allegation in the petition that the plaintiff had "suffered great expense" by reason of his injuries, *held*, that evidence of injuries to a mattress, quilt and bed springs occasioned by frequent applications of carbolic acid to the plaintiff's foot while confined to bed because of his injuries was competent.

*Appeal from Franklin District Court.*—HON. D. R. HINDMAN, Judge.

SATURDAY, OCTOBER 15, 1892.

This is an action to recover damages for a personal injury. The plaintiff, a young man aged nineteen years and eight months, was injured in mounting a moving box car for the purpose of setting the brake thereon. He succeeded in catching hold of the ladder on the car, and because of the height of the stirrup below the ladder, he did not place his foot therein, but attempted to make the ascent by placing his foot on the oil box on the axle, from which it slipped, and the car wheel ran over his foot, and crushed it so that it became necessary to amputate three of the toes, and the joints of those remaining are impaired, and the forward part of the foot is permanently injured. There was a trial by jury, and a verdict and judgment for the plaintiff for three thousand, five hundred dollars. The defendant appeals.—*Affirmed.*

*Lusk & Bunn, O. C. Miller* and *Andrews & Bedell,* for appellant.

*O. B. Courtright* and *Taylor & Evans,* for appellee.

ROTHROCK, J.—I.   One question of fact at issue between the parties was whether the plaintiff was an employee of the defendant at the time he

1. RAILROADS: employment of brakemen: authority of conductor.

received the injury for which he claims damages. The injury was received while the crew of a train was engaged in switching cars in the railroad yards at a station named Sumner. It appears that the branch line of the defendant running from Sumner to Hampton was operated by a train upon which there was a conductor, an engineer and fireman, and one brakeman, and another employee, who acted in the capacity of express messenger, baggageman, and brakeman. The name of the regular brakeman was M. W. Bailey. On the morning of

August 17, 1889, Bailey left his work to attend the funeral of his father. He quit the train at Waverly, on the way from Hampton to Sumner. The rest of the crew managed the train down to Sumner and back to Hampton. The plaintiff resided at Hampton, and he claims in his testimony that when the train reached Hampton he met Mortimer, the conductor, who asked him to go down with him to Sumner, and to make the run that afternoon, and that if he could go, he (Mortimer) would give him one hundred miles for it. He further testified, as to the employment and injury, as follows:

"I told him I didn't know, but I would see; and I went back to help him do his switching. He said he didn't know how it would be about sending in my time, but he would see Egan. Said he would see me paid, though. The trip I was to make is from Hampton to Summer and back. Leave Hampton at eight o'clock in the evening, and get to Sumner about twelve o'clock, as near as I remember. Leave Sumner, on returning, about seven o'clock, and get to Hampton about eleven next morning. One trip from Hampton to Sumner and back each day. When I started up towards the engine house, when I had this conversation with Mortimer about making the trip with him, he gave me no directions what to do. At this time the train was not made up, and I assisted in making it up by direction of Mr. Mortimer. He told me to go onto the engine and take signals for the wiper. He gave me as a reason why he wanted me to make the trip with him, his brakeman was laid off, and he couldn't make the trip without one. I was acquainted with the gang of men that run that train. Outside of the engineer and fireman, there were Mr. Mortimer, conductor, Mr. Winn, express messenger and baggageman. Mr. Bailey was the man laid off. I made the trip from Hampton to Sumner, and Mr. Winn and myself acted as brakemen.

We got to Sumner about twelve o'clock that night—the seventeenth. When we ran into Sumner, made the first stop at the junction, where the branch comes in onto the main line. This is where the Hampton branch strikes the main St. Paul & Kansas City line. We had to stop there in order to throw the switch, and then ran onto the main line right to the depot. To get from the Hampton branch to the depot we had to run in on the main line. We unloaded what freight we had at the depot, and then backed in on the Hampton line, over which we came. The first thing we then did was to cut loose the coach, and to kick that back on the Hampton line. I rode the coach back. Mr. Mortimer got off at the switch, and said, 'Ride her back ten or twelve car lengths,' which I did to what I thought was about that distance. When I rode the coach back ten or twelve car lengths, set the brake, and stopped it, I then went back towards the switch, to catch another car. While I was riding the coach back, the balance of the trainmen were kicking some more cars in on the main line of the side track branching off from the direct line of the St. Paul & Kansas City Railway. They kicked in four. Mortimer, at the time they kicked those in there, was at the switch, managing it. I stopped the coach about twenty or twenty-five rods from where he stood. Winn rode the four cars in onto the switch. This is a different track from the one they kicked the coach on. Directly across from where I stopped the coach to where Winn stopped the four cars is about four or five rods. There is another track intervening between the switch the four cars were kicked onto and the line where the coach stood. When I stopped the coach, and started back to the switch, another car was kicked in, and Mortimer hollered for me to catch it. He said, 'Catch her, Dan.' I started towards the car, and made an effort to catch it, and that is when my foot was caught. I got the

car. It was running about ten miles an hour. The distance it had to run from the switch before it would collide with the coach is about twenty or twenty-five rods. It is a little down grade the way the car was running. I had a lantern that evening, and as I went to catch the car the draft of the car put out my lantern, and I couldn't see where to step. I grabbed the car, throwed my foot up on the oil house, and my foot slipped right off, and it was run over. I went up and set the brake to stop the car, and it struck the coach hard enough to knock me down on it. I had set the brake at that time, and had hold of it. I got down off the car, found my foot was hurt worse than I thought it was, and went straight across to where the other brakeman stood with his lantern, and told him I had hurt my foot, and he said, 'I should think you had.' He showed me where the engine house was, and I went right there. I knew where it was, but it had kind of turned me around, and I didn't know which direction was which. I had no light with me at the time, for it had gone out when I caught the car. I went direct from the engine house to Shaw's house, which is close by. The engine house is about forty rods from the point where I got hurt. Mortimer gave me the lantern I had that night, between Hansel and Dumont. It was not in good condition. The wick was loose in the burner, and the least jar would put it out. It went out more than once on the trip, and I pulled up the wick, and lit it again. It went out at about every station we got out at. I made complaint, and asked for another lantern. When we were going into Sumner I set my lantern down on the platform of the coach, Mr. Mortimer standing there, and it went out. I said to him: 'That is a dandy lantern. I wish I had another one or two like it;' and he said, 'Make it do until we get down.' Mortimer was present when it went out this time."

The conductor, Mortimer, was examined as a witness in behalf of the defendant, and he denied that he employed the plaintiff to make the trip, but admitted that he allowed him to go on the train, and that the only work that the plaintiff was to do was to assist in loading and unloading way freight. It was a fair question for the jury to determine under the evidence whether the conductor employed the plaintiff to do the work of a brakeman. There is evidence in the case to the effect that the plaintiff had before that voluntarily assisted the train crew in switching cars at Hampton, and we think the evidence shows that while on the down trip from Hampton to Sumner he acted in the capacity of brakeman.

We do not understand counsel for the plaintiff to insist that the jury were not warranted in finding that the testimony of the plaintiff, above set out, so far as it pertained to the employment, is true. But it is most strenuously contended that the conductor had no authority to employ brakemen. There can be no doubt that he had no such general authority; that is, he was not authorized to hire and discharge the brakemen necessary to operate his train. But it is conceded that there may be such an emergency in operating a train that the conductor would be authorized to procure the necessary assistance to temporarily carry on the service, and it is said by counsel for the appellant that the case was tried in the district court on the theory that it came within the rule rule laid down in *Sloan v. Central Iowa Railway Co.*, 62 Iowa, 728, but it is insisted that the cases are different in fact and in principle. In the cited case, a brakeman was laid off for a week's rest, and the plaintiff took his place, with the knowledge and consent of the conductor, and acted as a brakeman for some six days, when he was injured. The conductor in that case testified "that to properly manage the train two brakemen were required, and

that there was but one other on the train besides the
plaintiff.'' It is further held in that case that, as ''the
regular brakeman was absent, it was immaterial .
whether with or without cause. The conductor con-
sented that the plaintiff should perform his duties.
We think when the regular brakeman is absent, and
the proper and safe management of the train so
requires, the conductor has authority to supply the place
of the absent brakeman, and, for the time being, such
a person is an employee of the conductor's principal.
Of necessity, it seems to us, the conductor must have
such authority.''

It is earnestly contended that the evidence in the
case at bar shows that there was no necessity to supply
the place of the absent brakeman, and that, as the train
was run from Sumner to Hampton without the regular
brakeman, it plainly appears affirmatively that there
was no such necessity. It appears to us that this con-
tention of counsel ignores the fact that it must be
conceded that the services of the brakeman Bailey, or
some other brakeman, were necessary for the ''proper
and safe management of the train.'' It surely ought.
not to be claimed that the defendant employed Bailey
as a mere supernumerary. The very fact that he was
employed as one of the crew was strong evidence that
his employment was necessary. It is true it was per-
haps physically possible for the train to be operated
from Hampton to Sumner without a regular brakeman,
but the jury was authorized to find that a brakeman
was necessary to the proper and safe operation of the
train. These considerations dispose of what we regard
as the principal question in the case.

II. The plaintiff claims that the lantern furnished
to him was defective, and that the light therein was.
2. Master and servant: negligence: personal injury: contributory negligence. extinguished, by reason of which he was
unable to see his peril in placing his foot
on the oil box, and that the ground where-

he was required to catch the car was not leveled up, but was rough and uneven, by reason of which it was difficult to mount the car; and that he was ordered by the conductor to catch the car when it was moving at a dangerous speed. It was not necessary that the plaintiff should prove all these averments. It is contended that the plaintiff cannot recover on account of the dangerous speed of the car, because he testified that. he knew of its speed before he caught hold of the ladder. But he was required to mount the car. It is true he might have refused to have done so because it was running too fast, or because his lantern went out, or because, when he approached the car, he discovered that the ground sloped away from the track so that he could not readily seize the ladder and place his foot in the stirrup. But he was acting under orders, and in an emergency which gave no time for reflection, and the jury might well find, as they did, that he was not chargeable with contributory negligence. *Greenleaf v. Illinois Central Railway Co.*, 29 Iowa, 47; *Crabell v. Wapalo Coal Co.*, 68 Iowa, 751; *Frandsen v. C., R. I. & P. Railway Co.*, 36 Iowa, 372.

III. The conductor testified on cross-examination that he gave the plaintiff twenty-five cents with which

3. —: —:  to procure his breakfast at Sumner. This
evidence.  evidence was objected to, and the objection was overruled. It is claimed this ruling was error. We think the claim is not well founded, for the reason that the conductor testified that he did not employ the plaintiff, and the fact that he paid him money, though a small sum, tended to corroborate the plaintiff's testimony; and every act of the two witnesses with reference to the trip, and what was done by each, was detailed by them in their testimony, and there was no reason why the payment of the twenty-five cents should not be shown. It was part of a continuous transaction or affair that could not well be excluded.

IV. When the plaintiff was injured he was taken
to the house of his sister, at Sumner, where he
remained some sixteen days. His sister
was called as a witness, and she testified
that during that time, by frequent appli-
cations of carbolic acid to the plaintiff's foot while in
bed, a mattress, a quilt, and bed springs were injured
to the extent of eleven dollars. This evidence was
objected to because "there was no charge of anything
of the kind in the petition." This is a mistake. It is
charged in the petition that the plaintiff "has suffered
great expense." It is true this was quite a general
averment, but it was sufficient to cover any proper
expense, in the absence of a motion for more specific
statement.

4. —: —:
damages:
pleading.

The questions we have discussed include every
material question in the case. They arise upon the
instructions of the court to the jury, and in rulings
upon the evidence, and in refusing to give instructions
to the jury requested by the defendant, and in overrul-
ing motions by the defendant to direct a verdict. We
have not set out the instructions or motions, but have
rather addressed ourselves to a consideration of the
questions as they are raised in argument. We find no
reason to disturb the judgment of the district court,
and we may say in conclusion that the motion filed by
the appellee attacking the record is not well taken.
We need not further allude to that feature of the case.
AFFIRMED.