HARDER & HAFER COAL MIN. CO. OF SULLIVAN COUNTY, IND., v. SCHMIDT.

(Circuit Court of Appeals, Seventh Circuit.   October 2, 1900.)

No. 651.

1. MASTER AND SERVANT—INJURY OF SERVANT—OBVIOUS DANGER.
   Where the condition of the roof in a coal-mine entry was called to, the attention of the superintendent, who did not regard it as dangerous, and dissuaded the employé who spoke of it from his apprehension, the owner cannot claim that the danger was so obvious that an employé who was injured by the falling of the roof either assumed the risk or was guilty of contributory negligence.

2. SAME—UNSAFE PLACE—MINERS.
   A miner who is permitted by his employer, either expressly or impliedly, to go to a certain place in the mine, and there receives injuries from causes of which he had no previous knowledge, but which were known to the employer, and should, in compliance with his duty to provide a reasonably safe place for his employés, have been obviated, may recover from the master for such injuries.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

The defendant in error was the plaintiff in the court below, and obtained a verdict and judgment against the plaintiff in error, defendant below, in the sum of two thousand eight hundred and ninety-five dollars damages for personal injuries received by the defendant in error in the mines of the plaintiff in error. The principal error relied upon is that the court refused, at the conclusion of the testimony, on motion of the plaintiff in error, to instruct the jury to find a verdict for the plaintiff in error.

The evidence was somewhat contradictory, but the facts found by the verdict of the jury, upon the instructions given, and supported by a sufficient weight of evidence, may be stated as follows:

The plaintiff in error was, on the 20th of December, 1894, a corporation under the laws of Indiana, conducting a coal mining business in Sullivan county in that state.

The general plan of the mines, so far as it need be considered, is, in substance: A long horizontal passageway called the "main entry" runs north and south past the foot of the hoisting shaft. This passageway is used for drawing cars of coal to the shaft. Other similar passageways used for the same purpose are cut at right angles to the main entry or passageway, and they also run in a horizontal direction, and the coal cars are drawn in them from the "rooms" where the miners excavate the coal, over to the main entry, where they turn and traverse the main entry to the hoisting shaft. These latter passageways, which run east and west, or at right angles to the main passageway or entry, are high enough for a man to walk in and wide enough for cars to be pulled through, averaging from six to nine feet in width.

From these east and west passageways the miners bore into the coal veins at regular intervals or distances along the passageway, and make what are called "rooms." The room is made by excavating or removing the coal, and it is in these rooms that the actual mining work of dislodging coal is per-

formed. Before the room is made, there is a piece of technical work performed called "turning the room," which means making a doorway from the passage into the room. This is done by picking or blasting a hole about four feet wide and four feet high into the side of the passageway, a distance of about six feet. When the miner clears out such a hole he may then remove the coal lying beyond and open up the area called the "room."

Sections 7472 and 7479 of the Mining Act of Indiana (Burns' Rev. St. 1894) are as follows:

"7472. Duties of Bosses.—That the mining boss shall visit and examine every working place in the mine at least every alternate day while the miners of such place are, or should be at work, and shall examine and see that each and every working place is properly secured by props or timber, and that safety in all respects is assured, and, when found unsafe, he shall order and direct that no person shall be permitted in an unsafe place, unless it be for the purpose of making it safe. He shall see that a sufficient supply of props, caps and timber are always on hand at the miners' working places. He shall see, also, that all loose coal, slate and rock overhead wherein miners have to travel to and from their work are carefully secured."

"7479. Mining Boss—Duties.—That in order to secure the proper ventilation of each coal mine, and promote the health and safety of the persons employed therein, the owner, operator, agent or lessee shall employ a competent mining boss, who shall be an experienced coal miner and shall keep a careful watch over the ventilating apparatus and the air ways, and shall see that, as the miners advance their excavations, all loose coal, slate and rock overhead are carefully secured against falling therein on the traveling and airways. He shall measure the air current at least once a week at the inlet and outlet. and at or near the face of the entries; he shall keep a record of such measurements which shall be entered in a book kept for that purpose, the said book to be open for the inspection of the mine inspector. He shall, also, on or about the first day of each month, mail to the inspector a true copy of the air measurements given, stating, also the number of persons employed in or about said mine. the number of mules and horses used and the number of days worked in each month. Blanks for this purpose shall be furnished by the state to the inspector and by the inspector to each mine boss."

In the operation of these mines the miners were paid sixty cents a ton for the coal mined and loaded, and two dollars for turning the room. In a general way, a miner, with his help or buddy, worked a room, each other miner, with his help or buddy, working some other room; but occasionally a miner had more than one helper, especially when he wished to help one who was waiting for a place as an employee.

The plaintiff, Herman Schmidt, was a practical coal miner of about twenty-four years experience. but had been employed in the defendant's mine for about two weeks. With his buddy. he was engaged in mining coal from one of the rooms.

On the day when the accident occurred the mine was shut down to such an extent that there could be no service of the coal cars. At the breakfast table that morning Schmidt was told by another miner, Ferdinand Yochem, that Yochem was about to start a new room about a thousand feet distant from the room assigned to Schmidt. and that if Schmidt and his buddy would help in turning this new room, the two dollars would be divided between them. To this Schmidt agreed. They went separately to the mine, the superintendent having been told by Schmidt that he was going to his room to finish picking up some loose coal, so that the room would be ready for the cars when they started again; and having been told by Yochem that he was going to the place assigned for the turning of the new room.

There was some dispute on the trial whether the superintendent had been told by Yochem that Schmidt would assist him in the turning of the room. The testimony of Yochem on that subject was as follows:

"Q. Did or did you not have any conversation with the superintendent about whom you should have to help you?"

"A. Well, I said to Lawrence [the superintendent] I take Fenger [Yochem's buddy] with me to this place and he said all right."

"Q. You said nothing about Schmidt? Did you say anything to him about Schmidt or Neuroth?"

"A. Yes, I told him in the morning I go down, I said to Schmidt and Neuroth you got lots of coal, you come down and help me in my place, and he said all right, I have nothing against it."

"Q. When you were talking with the superintendent was Schmidt there?"

"A. No, sir, Schmidt he was away before me at the boarding house."

The instructions given to the jury by the court upon this point were as follows:

"If you believe from the evidence that the plaintiff was engaged by the defendant to work in its mine in a certain room, and that the duties of the plaintiff did not call him to assist Yochem and Fenger, then the Court instructs the jury, that, unless they further believe from the evidence, that plaintiff was authorized or permitted by the defendant or some servant of the defendant's in charge and authority over the plaintiff to go to the place where he was injured, and that the condition of such place was unknown to the plaintiff, then the jury should find the defendant not guilty."

"The Court instructs the jury that if you believe from the evidence, that Herman Schmidt went to the place where Yochem and Fenger were at work, to aid them in firing the shot, without any instruction or authority or permission, expressed or implied, from the defendant or its duly authorized agent, to go there, and was injured by reason of his going there to assist in firing such shot, or to see that the same was afterwards properly fired, then the Court instructs you as a matter of law, to find the defendant not guilty."

There was no timbering or other protection to the passageway of the mine, and none at the place where the new room was to be turned. Immediately above this point was a fissure or seam in the ceiling of the passageway of such a nature that a portion of the rock in the seam was supported by the piece of the wall which was to be blasted away to make the doorway. The danger imminent from this fissure could have been avoided by the putting in of appropriate timbers. Yochem and the mine boss talked of this rock the day before, Yochem saying that the place "looked no good," but the mine boss saying that it could not fall down; that it was solid rock. Schmidt's attention, so far as the evidence goes, was not called to this fissure.

After doing a little work on the morning of the injury, in his own room, Schmidt and his buddy went to the place where Yochem proposed to turn the new room. The blast was set, and Yochem and Schmidt, with their buddies, withdrew until it was fired off. Shortly afterwards they returned, Schmidt being in advance, when the rock overhanging the seam fell, and caused the injuries for which the action was brought. Had the gangway at this place been properly timbered, the rock would not have fallen.

Some of the counts of the declaration proceed upon the common law obligation of the mining company to furnish a safe place in which the employees may work, and some of them upon the special statutes hereinbefore set out.

The bill of exceptions does not show that any exceptions were taken, after instructions, before the withdrawal of the jury, and the brief filed by the plaintiff in error does not set out specifically any instructions given, or instructions refused, or any evidence admitted, or evidence ruled out, upon which error is predicated.

O. W. Dynes, for plaintiff in error.

Cyrus J. Wood, for defendant in error.

Before WOODS and GROSSCUP, Circuit Judges, and BUNN, District Judge.

After stating the facts as above, GROSSCUP, Circuit Judge, delivered the opinion of the court, as follows:

Indisputably the plaintiff in error was bound by law to furnish to its employees safe gangways and working places. The statutes of Indiana are, in this respect, only supplemental to the common law

obligations. If, as the jury found, the plaintiff in error failed in the performance of this duty, causing the injury for which the action is brought, the action is maintainable, unless Schmidt was there without invitation, or had notice of the dangerous character of the place. The two inquiries thus suggested constitute the fighting ground of this case.

The evidence discloses that the imminence and nature of the danger was called to the attention of the mining boss by Yochem; that Yochem was assured that his apprehensions were unfounded; and that Schmidt had no knowledge of their existence. Whatever may be the exemption of the employer from liability for injuries caused by a danger that is obvious to the injured, such exemption will not be accorded where the nature of the menace is so uncertain as to cause discussion between the employees and the employer, with the result that the employer dissuades the employee of his apprehension; and especially so where the particular employee injured is without any knowledge of its existence. This disposes of the question of contributory negligence, and of any question growing out of the assumption of risk by the defendant in error.

It is not necessary, in this case, to determine, as a matter of law, growing out of his general employment, whether Schmidt was, at the place and time of the injury, within the protection of the general rule imposed upon employers to provide a safe place for their employees. The jury found, as a matter of fact, that Schmidt was present by the permission, either express or implied, of the superintendent. The evidence was somewhat uncertain whether the superintendent told Yochem, on the morning in question, that Schmidt might assist him. Yochem was an illiterate witness, and his answer might be interpreted to mean, either that he had told Schmidt to help him, and Schmidt said it was all right; or that he had told the superintendent that he had so told Schmidt, and the superintendent had said it was all right. But there is testimony of no uncertain kind that Yochem was permitted more than one helper, and, therefore, Schmidt was present, on the morning in question, under this general permission. The instructions of the court upon these issues were certainly as favorable as the plaintiff in error could demand, and we can see no reason why the verdict of the jury should not now be controlling.

The case made out, then, is that of an employee, permitted by the employer to go to a certain place in the mines, and there receiving injuries from causes of which he had no previous knowledge, but which were known to the employer, and which should, in compliance with its duty to provide a safe place to work in, have been obviated. Such a case is, of course, maintainable.

The judgment will be affirmed.