Railway Co. v. Bancord.

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY v. JEROAM E. BANCORD, *as Administrator, etc.*

No. 12,841.   (71 Pac. 253.)

SYLLABUS BY THE COURT.

1. RAILROADS—*Injury to Employee.* The doctrine of "assumption of risk" rests for its support upon an agreement of the employee with his employer, express, or implied from the circumstances of his employment, that his employer shall not be liable to him in damages for any injury incident to the service he is employed to perform, resulting from a known or obvious danger arising in the performance of the service.

2. ——— *Assumption of Risk—Defective Appliances.* The word "risk" in this connection includes more than a knowledge of conditions. It also includes a knowledge, or opportunity for knowledge, of the peril to the employee arising from conditions. Hence, before it may be held, as a matter of law, that an employee, by virtue of his contract of employment, assumed responsibility for a risk to which he was subjected in the use of defective appliances or instrumentalities furnished him for use by his employer, it must be shown that not only the defect itself was known by him to exist, or was of such nature that he should have known it, but that the peril to him arising from the use of the appliances or instrumentalities in their defective condition was also either known to him, or of such nature that he should have known it in the exercise of that reasonable and ordinary observation required of him for his safety.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed January 10, 1903. Affirmed.

STATEMENT.

THIS action was brought by Jeroam E. Bancord, as administrator of the estate of John Bancord, deceased, against the Atchison, Topeka & Santa Fe Railway Company, to recover damages for the death of John Bancord, which, it is alleged, occurred by reason of the negligence and wrongful acts of defendant.

John Bancord was at the time of his death in the

6—66 KAN.

| | |
|---|---|
| 66 | 81 |
| e68 | 488 |
| 68 | 527 |
| 68 | 646 |
| 66 | 81 |
| 69 | 122 |
| 69 | 743 |
| 66 | 168 |
| p69 | 867 |
| 66 | 81 |
| 74 | 92 |
| 66 | 81 |
| d76 | 73 |
| 76 | 113 |
| f76 | 131 |
| 66 | 81 |
| 78 | 423 |
| 80 | 719 |
| 66 | 81 |
| 82 | 138 |

employ of the defendant as a laborer, working in its scrap-yard at Topeka. In this yard there is a turntable used in moving disabled engines and defective cars from one part of the yard to another. On the date of the injury one Pettitt, an engineer in charge of a compressed-air motor, called to a workman by the name of Laycock to bring a man and assist in the moving of a dead and dismantled engine. This engine was to be moved from the north to the south part of the yard, across the turntable. Laycock directed Bancord to assist. It was the usual and customary practice, in moving such engines, to place a plank between the motor and engine, in lieu of a coupling, to be there held in place by some one while the engine was pushed forward over the turntable by the motor, watch being kept that the rails on the turntable were in line with the rails on the ground track. On this occasion Laycock procured the plank and placed it in position between the motor and engine, directing Bancord to stand to one side and watch that the rails were in alignment. Bancord said, "I will do this; you watch"; which Laycock did. The engine was pushed along, about one-third as fast as a man would ordinarily walk, from the ground track, upon, and over the turntable, Bancord walking between the motor and engine. Just as the engine passed over the turntable upon the ground rails at the south side, the plank was jarred or slipped from its place, and, although a signal to stop was promptly given and heeded, before the motor could be stopped Bancord was crushed to death between the motor and engine.

One of the specific acts of negligence charged against the defendant is that the turntable over which the engine was moved was permitted to become old, worn

and out of repair to such extent that a heavy weight upon one end would cause it to tilt downward until the table rails would drop below the ground rails; also, that the ends of the table rails and ground rails had become worn and broken, leaving a space between; that this space and drop of the turntable caused the plank to slip out of place, resulting in death to Bancord.   Upon this question, in response to special questions, the jury found as follows:

"1.  Was the turntable over which plaintiff's intestate was working at the time he was injured, and the track upon it, and the ground tracks coming up to it, in the same condition at the time of the injury that they had been during the time the deceased worked for the defendant in its shop yards?  Ans. Yes, except as natural wear would change them.

"2.  If you answer the last question in the negative, then state in what different condition the turntable and track upon it and the ground tracks coming up to it were at the time of the injury than they had been during the time that the deceased worked for the defendant in its shop yards.  A.  More worn.

"3.  If you answer that the turntable and the track upon it and ground tracks coming up to it were different at the time of the injury to plaintiff's intestate than they had been prior thereto while he was in the employ of the defendant in said yards, then state what changes had been made in those things and when such changes were made.  A.  No change except natural wear.

"4.  Was the condition of the turntable, the tracks upon it, the manner in which the turntable worked, and the condition of the ground track to which the turntable track was set when they were moving the dead engine over it at the time of the injury to the deceased open and obvious to the persons working upon and around the turntable and tracks?  A.  Yes, in a general way."

"6.  At the time the turntable was set for the ground track on which the dead engine was pushed by the

motor across the turntable southward did the turn-table track meet the ground track in the same manner that it had done when previously set in that way and so that the wheels of the dead engine could be run readily over the turntable track onto the ground track? A. Yes, in same manner, but engine did not pass readily.

"7. Did not John Bancord, the deceased, know, or have ample opportunity to know, of the condition of the turntable, the track thereon, and the ground track leading thereto and therefrom, prior to, and at the time of, the accident? A. Yes, he had opportunity. We do not know how ample."

"9. During all the time that the deceased was em-ployed by the defendant company to work in its shop yards at Topeka was he not working in and around the turntable and at times aiding and assisting in pushing cars and dead engines from the turntable onto the ground tracks therefrom? A. Yes, in a general way.

"10. Was the center of the turntable resting upon the little wheels and tracks at the bottom of the pit on which the table revolves a few inches higher than the edges of the pit surrounding the turntable? A. Yes.

"11. Was it not necessary for the turntable to be constructed in that manner in order to revolve and work easily and properly? A. Not necessarily.

"12. In the manner in which the turntable was constructed, being higher in the center than at the edges, did not the table by reason of that, when a weight was shoved upon it from one side, tilt so that the rails upon the table would meet the rails of the ground track? A. Yes, even going below the ground rails.

"13. In the manner in which the turntable was constructed, when a car or engine was pushed across it upon the track and passed beyond the center of the turntable, did not the turntable then tip down so that the turntable track would be even with, or nearly so, and meet the ground track? A. Yes, and even below.

"14. Was not the condition specified in the last two questions the condition of the other two turntables in the yards of the defendant at Topeka during the time the deceased worked there ?   A.  No.

"15. Was there any time when the turntable track on the table where the injury occurred, when set for the ground track at the south, tilted down several inches below the ground track ?   A.  Yes.

"16. If you answer the last question in the affirmative, then state specifically the time when you find that occurred.   A.  When the weight was on it.

"17. At the time of the injury to the plaintiff, did not the turntable track come down and meet the ground track as it has always been accustomed to do, and did not the wheels of the dead engine pass over the turntable track upon the ground track all right ?   A.  Yes, but engine did not pass over all right.

"18. If you answer the last question in the negative, then state whether the turntable track was higher or lower than the ground track and give the difference ?   A.  Turntable dropped lower than ground, about two inches."

"21. Did John Laycock, when he obtained the plank and placed it between the air-motor and the dead engine, do it intending to hold it while the dead engine was being moved from the turntable onto the track south of it ?   A.  Yes.

"22. Would John Laycock have done the work of holding the plank between the air-motor and the dead engine if John Bancord had not come and told him that he would do that work, and for him (Laycock) to do the watching ?   A.  We presume he would.

"23. Did not John Bancord voluntarily go in and take hold of the plank for the purpose of keeping it in position between the air-motor and the dead engine as they were moving it across the table onto the south track ?   A.  Yes, but he was ordered by his foreman to assist in this work.

"24. If you answer the last question in the negative, then state who ordered and directed him to do that ?   A.  His foreman ordered him to assist in the work.

"25. Was not the condition of the turntable, track upon it, and the ground tracks coming up to it, as open and obvious to John Bancord while working in and around there as to any other of the employees of the defendant? A. Yes."

"27. Had John Bancord assisted in the work of pushing dead engines by use of a plank or timber placed between that and the air-motor prior to the time of his injury? A. Yes, once before, but not over this table.

"28. Had not John Bancord, prior to the time of his injury, assisted in moving dead engines by means of a plank or timber placed between that and the air-motor, and himself held the timber in position while it was being moved? A. Yes, as answered above.

"29. In case you find for the plaintiff, then state specifically and definitely the particular negligence which caused the injury to John Bancord. A. The negligence consisted in the defendant company allowing the turntable to tip below the ground rails, and the battered or worn condition of the ends of the rails, both on the table and the ground, and also the large opening between the rails on the table and the ground rails."

There were also a general verdict and judgment thereon for plaintiff. Defendant brings error.

*A. A. Hurd*, and *O. J. Wood*, for plaintiff in error.

*Edwin D. McKeever*, and *W. S. McClintock*, for defendant in error.

The opinion of the court was delivered by

POLLOCK. J. : The only questions arising for our determination in this case are based upon the findings. There is but one question of merit in the case. It is not contended by the defendant that there is no evidence to support the findings made ; nor is it contended that the turntable was not old, worn, and defective. But it is contended that Bancord knew, or,

by the exercise of ordinary observation and care for his safety, should have known, the condition of the turntable and tracks,. and, having this knowledge, by virtue of his employment he assumed the hazard incident to their use. The general verdict being in favor of plaintiff, every presumption is in its favor. It is our duty in considering this question to harmonize the special findings with the general verdict if possible, and, unless the special findings are inconsistent with, or contradictory to, the general verdict, it must stand. (*Anderson v. Pierce*, 62 Kan. 756, 64 Pac. 633 ; *Kansas City v. Slangstrom*, 53 id. 431, 36 Pac. 706 ; *U. P. Rly. Co. v. Fray*, 43 id. 750, 23 Pac. 1039 ; *St. L. & S. F. Rly. Co. v. Ritz*, 33 id. 404, 6 Pac. 533.)

While the jury were not specially interrogated as to the space between the table rails and the ground rails, it is conceded that this space was from four to seven inches in length. The jury found that the tipping of the table rails below the ground rails, the battered and worn condition of the ends of the rails, and the large opening between the ends of the table rails and the ground rails caused the injury ; hence, it must be assumed that the company did not meet the requirements of its duty to furnish reasonably safe instrumentalities in the performance of this work. The question, therefore, is, Did Bancord assume the hazard incident to their use in this defective condition? That is to say, did he know, or by the exercise of reasonable precaution for his own safety ought he to have known, of the defects, and did he understand, or by the exercise of ordinary observation ought he to have understood, the risk he was incurring in making use of the instrumentalities in their defective condition? If so, he assumed the risk and cannot recover.

If he did not, the general verdict must stand. In the very nature of things, before it may be said that an employee by virtue of his contract of employment has assumed responsibility for a risk to which he has been subjected in the use of defective appliances or instrumentalities furnished him, not only the cause of this risk—that is, the defect existing in the appliance itself must be known to him, or be of such nature that it should have been known to him—but the risk or hazard to himself in the use of such appliances or instrumentalities in their defective condition must be either known to him, or of such nature that he should, by the exercise of reasonable observation and caution for his safety, have known of it.

The courts have sometimes arrived at this conclusion by consideration of the varying powers of observation possessed by different individuals, or by confusing the doctrine of assumed risk with the defense of contributory negligence. (*Railway Co. v. Michaels*, 57 Kan. 474, 46 Pac. 938; *Rouse v. Ledbetter*, 56 id. 348, 43 Pac. 249.) But, reduced to its last analysis, the doctrine of assumed risk must rest for its support upon the express or implied agreement of the employee that, knowing the danger to which he is exposed, he agrees to assume all responsibility for resulting injury. To raise an implied agreement the risk assumed must be known to the employee, or it must be of such nature as, by the exercise of reasonable observation and caution for his own safety, he should have known it. It can never be said that one has agreed to assume responsibility for that of which he had no knowledge, or of the existence of which he is not chargeable with notice.

"Assumption of risk is a term of the contract of employment, express or implied from the circumstances

of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself; but the correct statement is that no right of action arises in favor of the servant at all, for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume." (*Narromore v. Cleveland, C. C. & St. L. Ry. Co.*, 37 C. C. A. 499, 96 Fed. 298, 48 L. R. A. 68.)

Mr. Barrows, in his work on Negligence, section 43, page 111, says:

"It should be observed that it is not sufficient that the condition of the place, machine, utensil, or equipment is within the knowledge of the servant. In order to establish his assumption of the risk, it must appear that he knew, or in the exercise of ordinary prudence should have known, that the condition involved possible injury or risk. *Russell v. Railway Co.*, 32 Minn. 230, 20 N. W. 147; *Mundle v. Manufacturing Co.*, 86 Me. 400, 30 Atl. 16."

In *Gates v. State*, 128 N. Y. 221, 28 N. E. 373, it was said:

"While in work of an inherently dangerous nature the workman is ordinarily held to assume that certain risk which must attend upon its execution, that rule involves, and depends for its application upon the knowledge, or means of knowledge, upon the workman's part of the attendant peril to him. Such knowledge may be presumed to be possessed by reason of previous employment and experience, or to be suggested by ordinary observation and appearances. If the workman is without experience in the particular work required of him, and if, as here, danger for him exists from causes not apparent, but which are known to his employers, I think it unques-

tionable in principle that an obligation should be deemed to rest upon them to communicate such information as would apprise the workman of the nature of the work, and of the possible risks in its execution."

In *Russell v. Railway Co.*, supra, it was held :

"A servant does not necessarily assume the risks incident to the use of unsafe machinery furnished him by his master because he knows its character and condition.

"It is also necessary that he understood, or, by the exercise of common observation, ought to have understood, the *risks* to which he is exposed by its use."

In the opinion it was said :

"That the defendant was guilty of negligence in supplying its servants with such unsafe instrumentalities is very clear, and indeed is not seriously controverted. But defendant's contention is that plaintiff knew, or had the means of knowing, the unsafe character of these couplings, and, having continued their use without objection, he assumed all the risks incident thereto. We shall not here enter into any general discussion of the question when and under what circumstances a servant takes upon himself risks incident to the use of unsafe machinery, by continuing to use it without objection after knowledge of its defective character. We simply say that it is not enough that the servant knew or ought to have known the actual character and condition of the defective instrumentalities furnished for his use. He must also have understood, or by the exercise of ordinary observation ought to have understood, the *risks* to which he is exposed by their use."

While it may be said from the findings made by the jury that Bancord knew of the space between the table rails and the ground rails, and the battered and worn condition of the ends of these rails, and the old and worn condition of the turntable, because such defects were open and obvious, yet, as the jury also found,

while Bancord had assisted in moving a dead engine in the manner pursued in this case, but not over the turntable in question, it cannot be said that he knew, or from the nature of his employment should have known, from either experience or observation, that the condition of the turntable would permit the ends of the table rails to tip beneath a heavy weight, as they did, or that the tipping of the table, in conjunction with the obvious defects in the rails, tended danger to him.

It follows that, as the general findings are not inconsistent with the general verdict, and as it cannot be held from such findings, as a matter of law, that plaintiff assumed the risk to which he was exposed, the judgment must be affirmed.

All the Justices concurring.