WILLIAM WURTENBERGER v. THE METROPOLITAN STREET-RAILWAY COMPANY.

No. 13,428. (75 Pac. 1049.)

SYLLABUS BY THE COURT.

1. PRACTICE, DISTRICT COURT — *Personal Injuries — Demurrer to Evidence.* A workman, while operating a hydraulic jack, expressed fears to the foreman in charge of the work that further pressure would cause an iron bar standing between the jack and a steel beam on which one end of the jack rested to fly out, and asserted that the arrangement was not safe. The foreman assured him to the contrary, and directed him to go ahead with the work. The workman was inexperienced in the use of such appliances, and testified that he believed the foreman. On re-

suming work the renewed pumping of the jack caused the end next to the beam to turn the iron wedge, which flew out and injured the workman. *Held*, that, in an action for damages by the latter against a corporation in whose service the foreman was employed, a demurrer to the evidence interposed by the company was improperly sustained.

2. MASTER AND SERVANT—*Personal Injuries—Assumption of Risk*. Where a master orders a servant into a situation of danger, and, in obeying the command, he is injured, the law will not charge him with contributory negligence or with an assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under orders from one having authority over him.

Error from Wyandotte court of common pleas; WILLIAM G. HOLT, judge.   Opinion filed March 12, 1904.   Reversed.

STATEMENT.

THIS was an action for personal injuries. Plaintiff below (plaintiff in error here) and three other men were taking down and removing machinery from an unused power-house of the street-railway company. They were common laborers. The work was done under the orders of Charles Voght, a division superintendent, and Richard DeGroff, a foreman. At the time Wurtenberger was hurt, he, with the others, was attempting to remove a large wheel from its shaft by forcing the shaft through the wheel with the aid of a hydraulic jack. The wheel was first securely fixed in place. One end of the jack was then rested against the end of the shaft and the other against a steel beam. When pressure was applied to the jack the shaft did not move, but the beam, or a steel bar between it and the jack against which the end of the jack next to the beam was resting, deflected from its original position. Plaintiff below and one of his fellow servants were working the lever on the jack. While they were resting one of the men said to the foreman,

"That business ain't safe." The foreman looked at it and laughed, saying: "There is a greenhorn, and he is afraid the thing ain't safe. . . . That beam stands against anything." He further said: "Why, this hydraulic jack would raise 100 tons, and there is n't 50,000 pressure." The language of the foreman was given by the plaintiff below further on in his examination, as follows: "That beam stands most anything, and it will stand 100 tons, and we ain't got force for 50—go ahead and do your work." Plaintiff testified that he was afraid to work; that he had had no experience with a hydraulic jack before; that he believed what the foreman told him.

After this, while pumping the jack, the renewed force caused the end resting against the beam to turn the iron wedge, which flew out and struck plaintiff on the head. On cross-examination Wurtenberger testified:

"Ques. Now, I understand you to say that when you noticed it that the jack coming against it in that way and this iron bar in there, the top of the iron bar was loose—that is, a space; now you say it come right against it like that? Ans. Yes, sir; like that.

"Q. Now, you say that this part was away? A. Away—and then when DeGroff said we should take a little time it was leaning like that—it left room in there.

"Q. Was this iron bar bent at that time? A. No, sir.

"Q. The pressure on the iron bar, then, was being lessened and the greater pressure was at the bottom—is that right? You say it got loose here at the top? A. Yes, sir.

"Q. And the pressure at the bottom was greater at that time? A. Yes, sir; it teetered like that; like there was about two inches of space when I saw it.

"Q. Two inches of space in here? A. Yes, sir;

right on top of it, where it should be tight, it was about like that—two inches off.

"Q. And the lower part of the jack was still pressing the lower part? Was the jack still pressing against the lower part of the iron? A. Yes, sir.

"Q. Was this iron put in the widest way up and down? A. Yes, sir.

"Q. The widest way up and down and the lower part was still pressing on it, but the upper part was loose—that is, it was a space in there? A. Room—yes, sir.

"Q. Well, now, you noticed that? A. Yes, sir.

"Q. You noticed that it was getting loose there in that way? A. Yes, sir.

"Q. And you were the first one that did notice it, were you not? A. Well, I guess at the same time the other man noticed it at the same time, and then it was the same like one man—I said, and what they call 'Little Will' said, 'That business ain't safe.'

"Q. You said that? A. Yes, sir; I said it, too, and Little Will said it, and Mr. DeGroff he looked at it and laughed, then. First he said, 'There is a greenhorn and he be afraid the thing ain't safe.' He said, 'That beam stands against anything.'

"Q. Well, you said it was not safe, but it looks as though it would fly off and hit some one? A. Well, it looked that way to any man that was there; not only to me, but to any man that was there, that that wedge could fly off.

"Q. That was apparent to anybody that looked at it, wasn't it? A. Yes, sir; but Mr. DeGroff—"

"Q. He said 'go ahead and work,' and you went right back and went to putting on the lever on your press again? A. I don't have to go back. I was standing on the place when I said so, and the other men commenced to work, and I followed them to work then.

"Q. Now, did you go to work with your levers again, putting pressure on? A. Yes, sir.

"Q. How long did you work after that before this thing flew out as you thought it would? A. Just

one forcing on the lever, and that was the last; after we said it ain't safe, we give one more motion.

"Q. Just one more push of the lever and the thing flew out? A. Yes, sir.

"Q. Just as it appeared to you it would do if you put on any more pressure? A. Yes, sir.

"Q. It did just what you thought it would do, did it? A. Well, it flew out.

"Q. Well, it flew out just as you thought it would do? A. Yes, sir."

The court below sustained a demurrer to the evidence. Plaintiff in error complains.

*McGrew, Watson & Watson*, and *J. L. Smalley*, for plaintiff in error.

. *Miller, Buchan & Morris*, for defendant in error.

The opinion of the court was delivered by

SMITH, J.: It will be noticed from the testimony of plaintiff below, set out in the statement, that he and his fellow workmen asserted that the arrangement of the hydraulic jack rendered it unsafe when it was exerting force against the iron beam. They hesitated to go on with the work, but were directed by the foreman to proceed. The foreman knew the forcing capacity of the jack, and the workmen were ignorant of it. It cannot be held that knowledge of plaintiff below of the probable injurious result to him and the risk incurred from an obedience to the foreman's command was obvious and apparent. (*Railway Co. v. Bancord*, 66 Kan. 81, 71 Pac. 253.) He was a common workman, without experience in handling such appliances. His expressed fears that more pressure would cause the iron bar to fly out were overcome by the assurance of the foreman of its safety. The two were not on an equal footing. A reliance upon the superior

knowledge of the master, under the circumstances, was to be expected. The direction by the foreman to the men to go ahead and work was the best evidence to them then obtainable that the jack was safely adjusted. As to the apprehended danger, the master and servant did not agree. In *Harder & Hafer Coal Min. Co. v. Schmidt*, 104 Fed. 282, 285, 43 C. C. A. 532, 535, it was said:

"Whatever may be the exemption of the employer from liability for injuries caused by a danger that is obvious to the injured, such exemption will not be accorded where the nature of the menace is so uncertain as to cause discussion between the employees and the employer, with the result that the employer dissuades the employee of his apprehension; and especially so where the particular employee injured is without any knowledge of its existence."

In the circumstances of the present case, there was a difference of opinion between Wurtenberger and the foreman with respect to the danger attendant on a further use of the jack, after the employee had doubted its safety. In view of this disputed question of safety, it was proper that the jury should determine whether the workman was negligent. (*Miller v. Union Pacific Ry.*, 12 Fed. [C. C.] 600.) It must be remembered that the hydraulic jack was a mechanical device of great dynamic energy, which could not be readily known to a common laborer working with it for the first time. Its capacity and power were known to the foreman of the defendant below.

In *Seeds v. Bridge Co.*, ante, page 522, 75 Pac. 480, a workman was told by a foreman to remain in a dangerous place and adjust a rope used for hoisting. He was injured. The court said:

"We must further remember that he had just been hurried to the work, had been violently chided for too

great haste in getting away from this place of danger, had been told to remain there until sure that the fastening was secure, and had been informed by the foreman that he would tell the plaintiff when to get away. All this would have a strong tendency to make the plaintiff less observant of the dangerous surroundings, less critical as to unsafe conditions, and less competent to judge of danger to which he was exposing himself, growing out of these surroundings and conditions.'' (See, also, *Stephens v. The Hannibal & St. J. Ry. Co.*, 96 Mo. 207, 9 S. W. 589, 9 Am. St. Rep. 336.)

Plaintiff below testified that he believed what the foreman told him respecting the safety of the jack. The rule is that if the master orders the servant into a situation of danger, and in obeying the command he is injured, the law will not charge him with contributory negligence, unless the danger was so glaring that no prudent man would have entered into it, even under orders from one having authority over him. The degree of prudence exercised by the plaintiff below was a matter for the consideration of the jury. The demurrer to the evidence ought to have been overruled.

The judgment of the court below will be reversed and a new trial granted.

JOHNSTON, C. J., CUNNINGHAM, GREENE, BURCH, MASON, and ATKINSON, JJ., concurring.

SMITH, J. (dissenting) : The testimony of the injured person, in my judgment, shows that he had knowledge of the danger which menaced him, and that he assumed the risk. It is only by holding that plaintiff below did not mean what he said on cross-examination that he can be excused from remaining in a place of imminent peril until he was hurt. What he expected happened. He knew from the working

of the jack that it was exerting great force. This was apparent to any one, though not an expert. He testified :

"Ans. Well, I did n't have to examine the beam ; I just see that beam, and then I say, like the other man, 'that ain't safe.'

"Ques. Yes, you knew it was not safe. That is the principal thing that you knew about it ?   A.   That is the first thing I know ; yes, sir.

"Q. That was all that was said by Mr. DeGroff, was it ?   A.   Well, he said 'that beam stands most anything, and the hydraulic jack got a forcing ton and we ain't got forcing for fifty ton ; go ahead and work.'

"Q. He said 'go ahead and work', and you went right back and went to putting on the lever on your press again ?   A.   I don't have to go back.   I was standing on the place when I said so, and the other men commenced to work, and I followed them to work then.

"Q. Now, you did go to work with your levers again, putting pressure on ?   A.   Yes, sir.

"Q. How long did you work after that before this thing flew out as you thought it would ?   A.   Just one forcing on the lever, and that was the last ; after we said it ain't safe we give one more motion.

"Q. Just one more push of the lever and the thing flew out ?   A.   Yes, sir.

"Q. Just as it appeared to you it would do if you put on any more pressure ?   A.   Yes, sir.

"Q. It did just what you thought it would do, did it ?   A. · Well, it flew out.

"Q. Well, it flew out just as you thought it would do ?   A.   Yes, sir."

Plaintiff below cannot be excused for his exposure to danger by saying that he relied on the statement of the foreman that the appliance was safe when his testimony shows that he was convinced to the contrary, and that he knew that another turn of the lever would cause the iron wedge to fly out. It is said that

the knowledge of the foreman was superior to that of Wurtenberger. The latter, however, did not so testify. His knowledge of the dangers of the situation, if we believe his statements, was as ample as that of the foreman. I think the demurrer to the evidence was properly sustained. (*Clark v. Mo. Pac. Rly. Co.*, 48 Kan. 654, 29 Pac. 1138; *Walker v. Scott*, 67 id. 814, 64 Pac. 615, and cases cited; *Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 id. 129, 12 Pac. 582; *A. T. & S. F. Rld. Co. v. Schroeder*, 47 id. 315, 27 Pac. 965; *S. K. Rly. Co. v. Moore*, 49 id. 616, 31 Pac. 138.)