## GOLESH v. UTAH APEX MINING CO.

No. 2922.   Decided December 30, 1916 (162 Pac. 369).

MASTER AND SERVANT—ASSUMPTION OF RISK.   Where an experienced
    mine timberman had his leg broken by the fall of material
    from the part of the roof he was undertaking to timber while
    the earth thereabouts was being shaken by the operation of
    pneumatic drills, a dangerous condition, the employer was not
    liable for the injury, since the servant had assumed the risk,
    although his partner had told him the roof was safe, and the
    shift boss, when he made the suggestion, told him that the ma-
    chines could not be stopped while the timber was being put
    in.[1]

Appeal from District Court, Third District; *Hon. F. C.
Loofbourow,* Judge.

Action by Eli Golesh against the Utah Apex Mining Com-
pany, a corporation.   From a judgment sustaining defend-
ant's motion for nonsuit and dismissing the complaint, plain-
tiff appeals.

AFFIRMED.

*Willard Hanson* and *Thomas Marioneaux* for appellant.

*King & Nibley* and *P. T. Farnsworth, Jr.,* for respondent.

FRICK, J.

The plaintiff commenced this action against the defendant,
a mining corporation, to recover damages for injuries which it
is alleged the plaintiff sustained while working in defendant's
mine.   The material facts, briefly stated, are as follows:

On the 14th day of May, 1914, the plaintiff was in the
employ of the defendant as timberman in its mine.   It is
conceded that the plaintiff at the time was a competent and
experienced timberman, machineman and miner.   Indeed, the

---

[1]*Faulkner* v. *Mammoth M. Co.,* 23 Utah 437, 66 Pac. 799; *Frank* v.
*Bullion Beck, etc. Co.,* 19 Utah 35, 56 Pac. 419; *Toone* v. *J. O. O'Neill
Const. Co.,* 40 Utah 265, 121 Pac. 10.

plaintiff testified in his own behalf as an expert machineman, quartz miner and timberman. On the date aforesaid the plaintiff, by the shift boss of the defendant, one Kelly, was directed to assist one Snarich, who, it is also conceded, was an experienced machineman, quartz miner and timberman, and who also testified as an expert in the case, and who, plaintiff said, was his ''partner'' at the time of the accident, to put up some timbers in a certain stope in order to make the place safe for those who were required to work in said stope and to pass through it and to go to and from the face thereof. Two Sullivan or Ingersol drills were kept at work in the face of the stope breaking down ore and muck. On the morning of the accident Snarich was by Kelly directed to go to work near the face of the stope to put in some timbers. Snarich went to the place directed and shoveled away the muck so as to permit the placing of what are called square sets of timbers. The square sets in question were composed of four sawed upright timbers eight by eight inches square and about five feet in height or length. At the place in question, however, the roof of the stope being between six and seven feet high, shorter timbers, eighteen inches or two feet in length, were first put in place upon which the square sets were afterwards placed. A square set covers a space of area of five feet five inches square. Snarich commenced work about eight o'clock in the morning, at which time he says he carefully examined and sounded the roof of the stope at and near where the timbering was to be done for the purpose of discovering whether there was any loose material adhering to roof of the stope, and to remove it if there was any such. He says that after examining the roof of the stope carefully he found it sound and safe. He then commenced to prepare the ground for the purpose of placing the square sets. About eleven o'clock in the forenoon, or perhaps a little sooner, plaintiff also came to the stope as requested by Mr. Kelly to assist Snarich in putting up the square sets, and they both continued to work there until noon, when they stopped a half hour for lunch, and thereafter continued to work until about two o'clock, at which time they had the square sets nearly completed. While they were about to

wedge the square sets to the roof of the stope a considerable quantity of material fell from the roof above the square set and injured the plaintiff by breaking his leg about two inches below the knee. The plaintiff testified that when he went into the stope to commence work he found his partner, Snarich, working there; that plaintiff asked Snarich whether he had examined the roof of the stope and whether it was all right and sound, and whether he had "picked it down"; that Snarich informed him that he (Snarich) had examined it and "sounded it," and that "everything was all right"; that he (plaintiff) "believed and relied" on what Snarich had told him, and did not examine the roof of the stope himself, although he admitted that it was the duty of every timberman when he went to work to put up timbers to carefully examine the roof of the stope or place where timbers were to be placed, and that the timbers in this instance were put in to make the roof of the stope safe; that the stope in question was about thirty-five feet wide and of considerable length. He also said, "It (the roof of the stope) looked all right to me," and that it continued to look all right during all of the time he worked up to the time of the accident. The testimony of Snarich is to the same effect. He, in testifying to what occurred between him and the plaintiff when the latter came to work, said:

"Eli (plaintiff) came to me and said: 'Hello, John, how is your place?' I say, 'It is all right.' 'Have you everything down?' I say: 'Sure, it is all right now; it is a good place to work.' "

All this time the drilling machines were being operated by two machinemen to each machine, and were kept at work in the face of the stope some distance from where plaintiff and Snarich worked. The machines were being operated by compressed air, and their operation, both plaintiff and Snarich testified, caused the earth surrounding the machines for a considerable distance to vibrate or "shake," as they called it. Soon after the plaintiff had commenced to work with Snarich Mr. Kelly, the shift boss, also came into the stope. The plaintiff testified that he requested Kelly to stop the machines

until the timbers were put in place. Upon that subject the plaintiff testified:

"I said to him (Kelly), 'It will be a good thing to stop this machine for a while so we can throw this timber in and put it in shape as quick as we can and that helps a good deal.' * * * He said: 'We can't stop the machine. Men have to go on the same time that you are working, and they cannot do that that way. The machinemen can't make no time at all. It will be to the quitting time, and the machines has got to keep going to make muck for the night shift.' He then say: 'This is pretty good. John (Snarich) has been working all morning and picking it down, and it is in good shape now, and don't be afraid.' "

The plaintiff also says that he relied on what Mr. Kelly said about the place being "all right." Snarich, in referring to what was said by Mr. Kelly to the plaintiff, testified:

"Mr. Kelly go to.that place. Eli (plaintiff) was there, too, and me, and Eli says to Frank (Kelly): 'Frank, will it be all right to stop that machine while we are working in the open place?' And Frank says: 'She is all right. John (Snarich) was here all morning, and everything was picked down. Don't be scared. You keep going.' "

Plaintiff and Snarich then kept at work as before stated. The plaintiff, when asked what was usually done if a timberman asked that the machines be stopped, said:

"If a man is scared, he asks them to shut (stop) the machine. If he isn't scared, he don't ask them."

He, in speaking of himself, testified:

"I was scared something from above would fall."

That is, he feared that, if the machines were kept going, the vibration incident to their operation might cause material to fall from the roof of the stope. He, however, kept at work after what was said by Snarich and Kelly, and at no time made any examination of the roof of the stope, and paid no attention to it, except to look at it from time to time, when he says it "looked all right to me." Plaintiff, while testifying as an expert miner and machineman, also said that the vibration of the drilling machines caused the material to fall upon him and injure him. Mr. Snarich and two other wit-

nesses, testifying as experts, said that the vibration of the machines might have caused the material to fall from the roof of the stope.

Upon substanitally the foregoing evidence respecting the manner and cause of the accident the defendant moved for a nonsuit upon the grounds: (1) That plaintiff had failed to prove any negligence on the part of the defendant; (2) that the evidence showed that the plaintiff was guilty of contributory negligence as a matter of law; and (3) that the plaintiff had assumed the risk. The court sustained the motion and dismissed the complaint. Plaintiff appeals.

Both parties have devoted most of their arguments and citation of authorities to the latter proposition. The defendant, however, also contends that no actionable negligence on its part was proved. Assuming without deciding that there was sufficient evidence to go to the jury upon the question of defendant's negligence, yet the serious question that must be answered is whether or not, under the facts and circumstances disclosed by the evidence, plaintiff did or did not assume the risk of injury as matter of law. Plaintiff's counsel contend that plaintiff did not, while defendant's counsel vigorously insist that he did. His counsel insists that plaintiff did not assume the risk, for the reason that Mr. Kelly, who represented the defendant, gave assurances of safety upon which, under all the circumstances disclosed by the evidence, the plaintiff had a right to rely, and thus continue the work of putting in the timbers. Counsel have cited and relied upon the following cases in support of their contention: *Nugent* v. *Cudahy Pkg. Co.*, 126 Iowa 517, 102 N. W. 442; *Chicago, etc., Co.* v. *Sobkowiak*, 148 Ill. 573, 36 N. E. 572; *Schmit* v. *Gillen*, 41 App. Div. 302, 58 N. Y. Supp. 458; *Haas* v. *Balch*, 56 Fed. 984, 6 C. C. A. 201; *Harder, etc., Co.* v. *Schmidt*, 104 Fed. 282, 43 C. C. A. 532; *Consolidated, etc., Co.* v. *Shepherd*, 220 Ill. 123, 77 N. E. 133; *McKee* v. *Tourtellotte*, 167 Mass. 69, 44 N. E. 1071, 48 L. R. A. 542; *Beseloff* v. *Strandberg*, 62 Wash. 36, 113 Pac. 250; *Faulkner* v. *Mammoth M. Co.*, 23 Utah 437, 66 Pac. 799; *Frank* v. *Bullion Beck, etc., Co.*, 19 Utah 35, 56 Pac. 419; *Toone* v. *O'Neill Const. Co.*, 40 Utah 265, 121 Pac. 10.

Counsel for defendant contends that the foregoing cases are not in point, for the reason that in none of them is the question that is involved here discussed or decided. They insist that where, as here, a servant or employee is an expert, and where his knowledge of the danger, if any, was equal, if not superior, to the knowledge of the master, and where the facts and circumstances are such that it must be assumed that he knew, understood and appreciated the danger, the doctrine contended for by the plaintiff's counsel does not apply. We have carefully examined the foregoing cases, and it must be conceded that the question raised by defendant's counsel was not involved nor decided in any of them. In many of the cases the question of contributory negligence was involved, and in none of them was the servant an expert possessing equal or better knowledge than the master of whatever risk of injury or danger there might be as in the case at bar.

In support of defendant's contention counsel have cited and rely upon the following cases: *Showalter* v. *Fairbanks, Morse & Co.*, 88 Wis. 376, 60 N. W. 257; *Breckenridge, etc., Co.* v. *Murphy*, (Ky.) 38 S. W. 700; *Scott* v. *Delaware, L. & W. R. Co.*, 136 App. Div. 347, 120 N. Y. Supp. 895; *Knorpp* v. *Wagner*, 195 Mo. 637, 93 S. W. 961; *Hencke* v. *Ellis*, 110 Wis. 532, 86 N. W. 171; *Metallic G. M. Co.* v. *Watson*, 51 Colo. 278, 117 Pac. 609, Ann. Cas. 1913A, 1276; *Thurman* v. *Pittsburgh, etc., Co.*, 41 Mont. 141, 108 Pac. 588; *Rohrabacher* v. *Woodward*, 124 Mich. 797, 82 N. W. 797; *Anderson* v. *H. C. Akeley L. Co.*, 47 Minn. 128, 49 N. W. 664.

The foregoing cases are all directly in point upon the question raised by counsel. In addition to the foregoing cases, we also refer to the following authorities wherein the question of assumption of risk by a servant having equal knowledge of the conditions and danger with the master is discussed: 3 Labatt's M. & S. (2d Ed.), Section 879, also Sections 1179, 1182, 1184, 1186a, 1187, 1190, 1191 and 1219 to 1224; 26 Cyc., pp. 1202, 1203.

It should be noted, however, that the question that the servant had equal knowledge with the master, standing alone, is not necessarily and under all circumstances the controll-

ing one, but what controls is that the servant knew and appreciated the danger, and with that knowledge continued to perform the work or duties assigned to him.

In discussing the assumption of risk under circumstances very much like those in the case at bar in the case of *Scott v. Delaware, L. & W. R. Co., supra,* the court in the opinion said:

"The plaintiff's theory, aside from the contention that he was not furnished a reasonably safe place in which to perform his labor, is that in acting under the orders of Connelly, the foreman, the plaintiff was justified in accepting the supposed superior knowledge of the boss, and that it was negligent for the foreman to tell him to go ahead. But clearly the foreman was not giving him any positive orders. He merely expressed an opinion that the stone would remain in place, and there is not a single fact or circumstance which would justify the jury in believing that the foreman had any greater knowledge, or any greater experience than the plaintiff, or that the latter had any reason to expect that he would be discharged if he disregarded the so-called order to go ahead, or that he had any assurance of safety, other than the mere opinion of the foreman that the rock would not fall."

In the course of the opinion in *Hencke* v. *Ellis, supra,* Mr. Justice Marshall said:

"It is elementary that, where the dangers of a servant's working place are as open to his observation and knowledge as to his employer's—having regard for the duty of each to exercise ordinary care, and the quantum of care that may be reasonably expected of each, considering the kind of work to be performed—the servant assumes the risk thereof. The work respondent was employed to do was that of a specialist, the kind he was trained to do. He was not obliged to assume the risk of doing it in the way indicated, or excused for proceeding in that way, so as to hold appellants responsible for the safety of the casing, merely because they directed him to so proceed or assured him that it was safe to do so if he exercised ordinary care. An assurance of safety in such a case is not material, except where the person giving the assurance must be presumed to have better judgment or information than the assured, so that the latter may reasonably rely thereon instead of on his own judgment."

In *Rohrabacher* v. *Woodward, supra,* the doctrine is stated in the headnote thus:

"An experienced servant of mature years cannot continue to operate a machine which he knows is dangerous without assuming the risk, simply because the employer has assured him that it is safe, when the servant has just as much knowledge of the danger arising from its operation as the employer."

In 26 Cyc. 1202, 1203, the rule is stated in the following language:

"The general rule is well settled that, where the master and servant are possessed of equal knowledge, or means of knowledge, of defects and dangers, or where they are equally ignorant thereof, the servant assumes the risk; and the same is true a fortiori where the servant has better means of knowledge than the master. But if the master knows, or is under an obligation to know, of dangers of which the servant is ignorant, and of which he is not under an equal obligation to know, there is no assumption of risk."

In 3 Labatt's M. & S. (2d Ed.), Section 897, the author says:

"The doctrine applied in the older English cases and in all the American cases up to the present time, with a few possible unimportant exceptions, is that, in the case of all adult servants except seamen, the action must be declared not to be maintainable, as a matter of law, if the evidence leaves no reasonable doubt that the servant comprehended the abnormal risk which caused his injury."

The same author further says (Section 1184):

"The servant is frequently said to be incapable of maintaining the action where his knowledge of the risk which caused his injury was, as compared with the master's knowledge, either equal or superior. But this form of expression is obviously of no special significance in a logical point of view. If the servant knew of and appreciated the risk in such a sense and to such an extent that he must be deemed to have accepted it as one of those incident to the employment, his inability to maintain the action is a necessary inference, irrespective of whether his master possessed the same or a less amount of information in regard to the subject-matter. As it is the knowledge of the servant which withholds from him a right of action, it is immaterial that the master also knows of the conditions which produced the injury."

It is not necessary to quote further from the authorities.

It seems very clear to us that there is no room for any difference of opinion in this case regarding plaintiff's assumption of the risk incident to putting up the timbers in

the stope at the time and place in question. He was not only an expert timberman and knew and fully understood and appreciated the risks incident to that calling, but he testified that he was also an expert miner and machineman. It is manifest that he knew and appreciated the danger, if any there was, in keeping the two drilling machines in operation. He had, prior to that time, worked in the stope in question, and was familiar with all the prevailing conditions. If, there-fore, it was dangerous to keep machines in operation, he knew, and appreciated the danger or risk from that source as fully as any one could or did appreciate such a danger. His own testimony is conclusive upon that question. The case at bar comes squarely within the class of cases where a servant, as Mr. Justice Marshall says, was a specialist, and as such continued to perform the special duties assigned him by the master after having as full knowledge of the condi-tions and dangers incident to the special work as any one could have. As a matter of course, no one had or could have positive knowledge with regard to whether any debris would fall from the roof of the stope or not. The plaintiff, how-ever, possessed as much knowledge upon that subject as any one, and he as fully appreciated the danger from that source as any one could. This is made manifest from what he says. He tells us he was afraid something might fall from the roof of the stope. He could only have expressed himself thus after having fully sensed and appreciated the danger inci-dent to putting up the timbers. It is therefore a clear case of continuing to work with full knowledge of whatever dan-ger there may have been. Nor can he escape the consequences merely because Mr. Kelly, the shift boss, said: "It is all right. Be not afraid. Go ahead." In any event Mr. Kelly only expressed his opinion or gave his judgment with re-spect to the safety of the roof of the stope. The plaintiff had no right to rely upon Mr. Kelly's judgment when he knew and appreciated the conditions precisely the same as Kelly knew them to be. Nor is there anything in the evidence in that connection for the jury to pass upon. There is no question of disputed fact, nor is there anything upon which different minds might arrive at different conclusions with

respect to plaintiff's knowledge of the conditions surround-
ing him. In view of his expert knowledge as a miner, ma-
chineman and timberman, the law conclusively assumes that
he understood and appreciated the risk, if any·there was.
No other result is permissible unless the rule be adopted that
a jury may excuse A in one case and may bind B in another
under the same conditions and circumstances. All the jury
could do in this case would be to find an excuse for plaintiff
when the law admits one. Contributory negligence is not a
factor in this case.

In view of the conceded facts, therefore, we are of the opin-
ion that the ruling of the district court in sustaining the
motion for a nonsuit was clearly right, and hence the judg-
ment should be, and it accordingly is, affirmed at plaintiff's
costs.

McCARTY, J., concurs.


STRAUP, C. J.

I concur. But I think the case ought to be ruled on the
theory that the plaintiff, while hardly an expert, yet an expe-
rienced timberman and miner, was engaged at work making
a place safe, and was employed for that purpose, timbering a
stope to prevent rock and other material from falling. While
doing that work he of necessity was exposed to dangers of
rock and earth which might become loose and fall. But that
was incident to work in hand, and as to him was but an
ordinary risk, not only as to rock which might be loose when
he entered the stope, but also which might become loose in
the ordinary and usual prosecution of the work, or from nat-
ural causes. In other words, this servant was employed to do
and was engaged at master's duty making a place safe and
guarding and protecting the stope against material likely to
fall or cave. That the danger to which he was exposed was
not, as is argued, from loose, overhanging rock when he en-
tered the stope, but from rock and earth that might be loosened
from vibrations of the ground caused by operations of drilling
machines, is not, as it seems to me, of controlling importance.
True, such dangers might have been avoided by the suspension

Vol. 49—16

of such operations. But they were such as arose in the usual and ordinary prosecution of the work and as an incident thereto. It was such a danger concerning which the plaintiff expressed a timidity or fear and concerning which the statements of the defendant's shift boss were made. And then the plaintiff's request to stop the machines were denied. He knew the operations would and did continue. He thus was not misled, nor did the minds of the parties come to any understanding or agreement as to that. What effect the operation of the machines would have on the ground where plaintiff was at work was largely conjectural. It is not a case where assurances are given as to a condition or danger concerning which the master was presumed to have, or where any one could have knowledge other than mere opinion, and one, too, not concerning an existing, but as to some future, condition or danger, and, most of all, an opinion or conjecture concerning a danger which the plaintiff was employed and undertook to guard and make safe. True, the master, by contract, may assume the risk even as to that, may take upon himself and relieve the servant from all risk, but to do so requires language and terms more explicit and comprehensive than we have here. I therefore think the judgment should be affirmed.