## LOS ANGELES & S. L. R. CO. v. SHIELDS.

Circuit Court of Appeals, Eighth Circuit.
May 11, 1929.

No. 8337.

Robert B. Porter, of Salt Lake City, Utah (George H. Smith, John V. Lyle, and W. Hal. Farr, all of Salt Lake City, Utah, on the brief), for appellant.

B. L. Liberman, of Salt Lake City, Utah (Willard Hanson, of Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

LEWIS, Circuit Judge. Because of alleged negligence appellee recovered judgment for permanent personal injuries received while he was at work in appellant's railway tunnel. The tunnel was being widened and raised in height to accommodate two main tracks instead of one. Experienced miners were employed to do the excavating, that is, to drill and shoot down the rock and other material to be removed. Appellee, then between 23 and 24 years old, was first employed in the work as a miner, but was discharged at the end of a month because he did not know enough to do that kind of work. He was then employed as a mucker, that is, to help in removing the débris from the tunnel and such other work as he might be called on to do. He had had some experience as a mucker in mines. He and other men who worked with him were subject to the orders and direction of one O'Brien, who was the shift boss over them and an experienced miner. Appellee did some work outside of the tunnel. He received the injuries within two months after his second employment.

The ground through which the tunnel was driven was not solid rock formation. It is called a conglomerate by miners, consisting of boulders, clay seams, broken rock and dirt. The overhead mass stood firm at places and was hard to pry loose. It was spoken of as a solid conglomerate. At other places it would fall if not supported after being undermined and exposed. The miners found it necessary for their protection to follow their excavations at short intervals with supporting timbers, usually not more than four or five feet from the breast. Concrete was finally put in overhead and on the sides.

The great weight of the evidence of skilled miners who worked there was to the effect that stability of the roof or back of an excavation, whether it was or was not likely to fall, could be ascertained by sounding it with a bar or other iron tool, and that was the practice. If it had a "drummy" sound it was unsafe, would likely fall.

Four rooms each about 11 feet long, 8 feet wide and 8 feet high had been driven into the sides of the tunnel, two on each side. On the day appellee was injured he and others under the supervision of O'Brien put roof-supporting timbers in one of these rooms. Nicholson, the general foreman of tunnel construction, came by and appellee heard him tell O'Brien to take men to the other room, "and pick her down for timbers." Then O'Brien took appellee with him to the other room. Arriving there O'Brien sent appellee for a pick. On his return O'Brien instructed appellee to scale off an uneven place in the roof with the pick so that supports and proper timbers for the roof might be put in. Appellee testified that when O'Brien showed him where to pick and how to pick off, he asked O'Brien: "Well, how is the back?" And O'Brien said: "Oh, she is fine and dandy; you needn't be afraid of the back. I examined her and she is just fine." The back is a miner's word for roof. O'Brien testified that he sounded the roof while appellee was gone for the pick and that he told appellee when he returned that it was safe. Appellee got upon two planks which were supported at their ends and were about three feet from the floor of the room and began to use his pick, as he was instructed to do by O'Brien. After a few minutes a part of the roof just behind him fell, struck him, carried him down, fractured his lower vertebræ and caused permanent paralysis in both legs. He testified, without contradiction, that his picking had nothing to do with the roof falling on him from behind.

At the close of all the evidence, and after some discussion by counsel, the court announced that it would submit the case on one proposition only: "That is, whether or not Mr. O'Brien inspected the roof or back before he put the plaintiff to work; or if he did inspect it, if he did it in the manner in which said inspection and sounding is usually done by an ordinarily careful miner." That was the issue submitted to the jury. The jury was further instructed that the plaintiff assumed all of the ordinary risks and dangers incident to his employment and also all risks and hazards which were either known to or appreciated by him or which were open and obvious, or which were so open and obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. That it was the duty of the foreman under whom plaintiff was working to exercise reasonable care to see that the place where the plaintiff was directed to work was reasonably safe to work in, and that the

fact that the material fell from the roof was not proof of negligence, that if by the exercise of reasonable care the foreman could have discovered that the roof was unsafe to work under and the plaintiff was injured as a result of the foreman's failure to exercise reasonable care the plaintiff would be entitled to a verdict. The jury was further instructed that if the roof became loosened and fell upon plaintiff as a result of his using his pick on it the verdict should be for the defendant.

█ The instructions of the court are not criticised as ground for reversal. The two propositions argued here are, that the evidence failed to disclose that defendant was guilty of any negligence, and that the plaintiff was injured as a result of a risk which he assumed; hence, the court erred in refusing defendant's request for an instructed verdict. The main controversy is one of fact. O'Brien was an experienced miner. He testified that he inspected the roof in the usual way by sounding, while appellee was away looking for a pick, that from his inspection he believed the roof was safe and told appellee so on his return, and that the roof did not sound drummy. No witness testified that O'Brien did not inspect the roof nor that he was not competent to do so. O'Brien weakened somewhat the weight of his own testimony. His evidence likely left in the minds of the jury, as it reasonably could, the impression that he did not believe sounding a roof was as good a test of its safety as did other miners who testified, that he put great weight on the appearance of things, and that simply by looking at a roof he could usually tell whether it was safe. Furthermore, Nicholson in giving instructions as to the work said nothing about testing the roof. This room had been excavated and left for more than a week. Other miners testified that while sounding was not an infallible test it was the best method known. O'Brien testified that sounding was the best test, but he had found drummy ground in this tunnel and then could not get it down with a pick. He rather belittled sounding in this formation. On this other experienced miners working there sharply disagreed with him. Appellant's foreman of the miners had been a miner, had worked in many tunnels, had had 21 years' experience in mining and tunnel work. He saw the débris that fell from this roof and injured appellee, and he testified that judging from the amount of dirt that fell in this place sounding generally tells whether it is going to fall or not. There was, we think, an issue, under the testimony, whether O'Brien tested this roof by sounding, and if

he did, the further issue whether in doing so he made a reasonably careful test; and those issues, in our opinion, were properly submitted to the jury. A temporary timber with a cap would have held in place the part that did fall. O'Brien said he could have put in the temporary timber, but he did not think it was needed, that they timbered bad ground for safety, but he did not consider this bad ground. He knew the roof had been exposed for several days. On that the testimony was that the excavation of the room had been finished for at least eight days, and passing trains and exposure tended to loosen the roof. He further said he was not in the habit of leaving so large a space untimbered in prosecuting the work. Appellee relied on O'Brien's assurance that the place was safe, and there is nothing which tends to show that the dangerous condition was plainly observable or that he was aware of it. He therefore had the right to assume that his employer had taken proper care for his safety.

The submission of the case to the jury on the principles stated is sustained, we think, on authority. Union Pac. R. Co. v. Jarvi (C. C. A.) 53 F. 65; Haas v. Balch (C. C. A.) 56 F. 984; Harder & Hafer Coal Mining Co. v. Schmidt (C. C. A.) 104 F. 282; Federal Mining & Smelting Co. v. Anderson (C. C. A.) 247 F. 472; Dasher v. Hocking Mining Co. (C. C. A.) 212 F. 628; Hall v. Manufacturers' Coal & Coke Co., 260 Mo. 351, 168 S. W. 927, Ann. Cas. 1916C, 375; Carter Coal Co. v. Pritchard's Adm'r, 166 Ky. 776, 179 S. W. 1038. There is not the slightest evidence here that appellee knew the dangerous condition of the roof until it fell upon him, and he cannot be held to have assumed that risk. Chesapeake & O. R. Co. v. Proffitt, 241 U. S. 462, 468, 36 S. Ct. 620, 60 L. Ed. 1102.

The judgment appealed from is Affirmed.