THE ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY
v. H. J. MORRIS.

No. 15,244. (93 Pac. 153.)

SYLLABUS BY THE COURT.

1. RAILROADS — *Injury to Employee — Defective Appliances.* Where the rules of a railroad company require the employees, in case of danger to the company's property, to unite to protect it, and where, in a case of apparent danger to such property, a conductor orders his brakeman to stop a moving car from which such danger by an impending collision with a piledriver may be fairly anticipated, the brakeman, if he has no knowledge or notice to the contrary, may act upon the assumption that such car is furnished with the ordinary and proper appliances for the safety of employees in performing their duties.

2. MASTER AND SERVANT—*Contributory Negligence—Assumption of Risk.* Where a master orders a servant into a situation of danger, and in obeying the command the servant is injured, he will not be charged with contributory negligence, or with an assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under such orders, provided he acts with reasonable prudence in executing such orders.

3. ——— *Negligence a Question for the Jury.* Whether the hazard is so great that a reasonably prudent man would not undertake the service required, and whether, when undertaken, the employee proceeded with reasonable care, are, where the evidence is conflicting, as in this case, questions of fact for a jury; and the finding of a jury thereon, where proper instructions were given, must be sustained.

Railroad Co. v. Morris.

Error from Sedgwick district court; THOMAS C. WILSON, judge. Opinion filed December 7, 1907. Affirmed.

STATEMENT.

THE plaintiff, H. J. Morris, suffered personal injuries causing the loss of his leg below the knee. The action was for damages for the injury. He alleged negligence on the part of the defendant, as follows:

"In failing to provide suitable handholds and brakes, couplers and apparatus on the car which he was directed to stop, . . . and in carelessly handling said cars, and in carelessly sending this plaintiff to a place of danger and requiring him to act in an emergency, without warning and without taking proper precaution against injuring him; . . . that paragraph 'L' of the general rules of the Frisco system provided: 'In case of danger to the company's property employees must unite to protect it;' . . . that punishment was provided for servants disobeying said rule; . . . that plaintiff undertook to stop the car in question in accordance with and in obedience to said rules, and in accordance with his general duties as brakeman, and with the directions of the conductor of his train; . . . that the car which plaintiff tried to stop was a freight- or work-car which was then and there in use by the work crew in charge thereof, and said car was without any proper handholds, brakes or appliances usual and necessary for use by brakemen and others in handling, controlling or stopping such car, the handbrake had been removed therefrom and no airbrake was accessible or available, and plaintiff first ascertained these facts when he reached the end of the car for the purpose of applying the brakes; . . . plaintiff says that if the handholds or the brake itself had been on said car, in proper condition, he could have held to same and stopped the car, and saved himself as well as defendant's property from injury."

The plaintiff was a brakeman on the local freight-train of the defendant running from Wichita to Ellsworth. This train was standing on the main track at Burton, while the track in front, or to the north, was being cleared of flat cars, part of a work train, con-

sisting of a pile-driver and accompanying tool-cars, and flat cars used in carrying piles. The pile-driver and two tool-cars stood on the side-track west of the local train, and about two or three car-lengths south of the engine of the latter. The engine of the work train was shoving a flat car from the main track, about 400 feet north of the pile-driver, to the side-track. The pile-driver stood on this side-track, with the leads, or guides, in front, so that a car coming down the track from the north, if not stopped, would collide with these guides, and might injure the pile-driver. On the west side of the side-track, and just north of the pile-driver, were piles to be loaded on the flat cars. When the engine had pushed the flat car past the connecting switch, and upon the side-track, it was cut off by order of the conductor, and the car was left to roll down the track—there being a slight down grade there—toward the guides of the pile-driver. As the car passed by the side of the local train the conductor and a brakeman of that train were walking along with, and on the east side of, the moving car, thrusting blocks under the wheels, endeavoring thereby to stop it, but apparently without success. It was moving at the rate of about four miles per hour. The plaintiff passed around in front from the east side of the engine of the local train to the west side. As to what then occurred he testified as follows:

"Just as I got there I saw somebody about the car; somebody had lost control of it, and was trying to stop it with chunks, and my conductor said, 'For God's sake, stop that car.' It was going toward the guides on the pile-driver. I ran over; I thought the brake was laying down on the car, as they often do on flat cars, and when I got in around the end I turned and grabbed for the brake. There was no brake, and I grabbed for the handhold; and there was no handhold, and I grabbed the chain, and it was still fastened to the brake-rod, but disengaged from the lever; and it came all at once and I fell, and scrambled along a few feet, and I fell and caught this leg and crushed it right across there."

Railroad Co. v. Morris.

The brake-staff had been removed, for convenience, it seems, in loading piles, and this was known to the conductor. The handhold had been broken off or removed in some way, but when the evidence does not show. There was an uncoupling-rod with pin lever on that end of the car. The car was stopped immediately after the plaintiff was injured. The cries of the plaintiff attracted the attention of the trainmen, who found him just outside of the west rail, having pulled back the mangled leg before the second wheel could reach it. It appears that upon a former trial the plaintiff had testified that it was his purpose to steady himself by the handhold with one hand and try to stop the car by pulling on the chain with the other, when, the chain coming "all at once," he stumbled and fell. On this trial on cross-examination he admitted that he had so testified, and that in taking hold of the chain he thought he could assist in stopping the car in that way; that it naturally came into his mind to do so, and that he was walking backward pulling the chain when he stumbled anl fell. In further explanation of the occurrence the plaintiff testified:

"Ques. Now, why did you go in to stop that car? Ans. Well, the rules demand that I should protect the company's property, in case of danger to it, and my conductor ordered me to do so.

"Q. What property were you seeking to protect? A. Company's property.

"Q. What property? A. The pile-driver, in particular."

"Q. What use did you seek to make of this handhold when you grabbed for it? A. To steady myself.

"Q. In what way? A. Well, just to keep from— that is what that is naturally there for.

"Q. What is a handhold for? A. For that purpose —to steady yourself, and to protect you from falling underneath the cars.

"Q. And working between the cars? A. And working between the cars.

"Q. Well, if there had been a handhold there, after you found there was no brake, what use could you have made of that handhold? A. Could have held myself

up, easily. . . . No. I got clear across the track and came up to the car; could see that the brake was n't there just as I turned around and saw the beam there; it all came to me all at once. In looking for the brake-staff there the car came up to me and I grabbed for what was there. No grab-iron and no brake-staff. . . . Yes. When I ran around the car, the first thing I looked for was the wheel on the outside of the end of the car; saw the wheel was not there, and naturally my eye would glance on toward the injured part of the car to see what the rest of the defects was, and when it got closer up I grabbed for the grab-iron.

"Q. You had considered when you went there, whether the grab-iron was there? A. I was considering it; in the impulse grabbed for the brake-wheel. Grabbed for that; naturally would be the first thing that stuck out from the car. I glanced and it was not there, and glanced along where the brake-staff would have been laid and seen the brake-staff completely gone, and as the car came up to me I grabbed for the grab-iron and it was gone too, and the first thing my hand fell on was the chain."

"Q. You did not attempt to step west of the car? A. Well, I attempted to shove myself away from the car.

"Q. How much? A. Of course, the car coming toward me, nothing there to get hold of to spring against to get away, any more than putting your hand against a flat surface and shove yourself sideways from it."

"Q. You say you lost your balance? A. Yes, sir.

"Q. How did you come to lose your balance? A. Naturally when you come to the car you take hold of the grab-iron. There was no grab-iron there and I grabbed hold of the chain and in order to use the chain to steady me, and lost my balance for the reason that the chain came all at once, and I fell down. Could probably have steadied myself much better if I had n't grabbed hold of the chain; if I had thrown my hand against the car, or something; but grabbed hold of the chain, and the whole chain coming—the whole thing being disconnected, was really what lost my balance.

"Q. Is that the way you lost your balance? A. It is.

"Q. Cannot tell just how you lost your balance? A. Yes, sir. I grabbed the chain to steady myself."

"Q. If that brake-wheel had been bent down, would

not the brake-wheel been west of the west line of the car? A. A few inches; yes, sir.

"Q. Three inches west of the west alignment of the car? A. Yes, sir.

"Q. And to attempt to turn that brake-wheel for the purpose of winding the brake-chain and setting the brake-shoes on the wheels upon it properly and so as to take hold of the brake-wheel with both hands to turn it? A. That is probably true, but there was piling laying outside the rail so I could not walk along this piling and do that."

The plaintiff noticed that the brake-staff was not standing when he started around the car, but supposed that he would find it laying down. He had been in railroad service about ten years—three years as brakeman.

The conductor, Sheuerhoff, testified that he did not give the order to stop the car, and the conductor and the brakeman of the work train testified that they did not hear such an order given, and the brakeman at the front wheels testified that he did not remember such an order. The conductor of the work train and the plaintiff's fellow brakeman testified that the plaintiff said, when they went to him after the injury, in response to an inquiry, that he had climbed on the brake-beam, pulled the brake-chain, and slipped and fell. The fireman of the local train said that looking· out of his cab window he saw· plaintiff climb on the car, pull the chain, and fall off. On the other hand, the brakeman who was at the front wheels on the opposite side of the car, and nearest to him, said that plaintiff did not ride the brake-beam, adding: "I do not think he did."

The jury found for the plaintiff, assessing his damages at $2000, and returned the following findings:

"(1) Ques. When plaintiff first discovered the absence of the brake-staff from the car, had he approached so near to the moving car that he could not safely attempt to get away from the car? Ans. Yes, could attempt but not safely.

"(2) Q. When the plaintiff discovered the absence of the brake-staff from the moving car was the car

moving more rapidly than plaintiff could walk? A. Yes, in his position.

"(3) Q. When the plaintiff discovered the absence of the brake-staff from the moving car did he attempt to get away from the car? A. Yes.

"(4) Q. If the foregoing question three is answered in the affirmative, then state in what manner the plaintiff attempted to get away from the car. A. By grabbing for handhold to steady himself.

"(5) Q. When plaintiff discovered the absence of the brake-staff from the moving car, what distance was the car from the pile-driver, as near as you can determine from the evidence? A. Forty to fifty feet.

"(6) Q. When plaintiff discovered the absence of the brake-staff from the moving car, did he take hold of the brake-chain with his hand? A. Yes, to steady himself.

"(7) Q. When plaintiff discovered the absence of the brake-staff from the moving car, did he take hold of the brake-chain and pull it? A. Yes.

"(8) Q. After plaintiff discovered the absence of the brake-staff from the moving car did he take hold of the brake-chain intending to pull the chain while moving along in front of the car? A. No, to steady himself.

"(9) Q. When plaintiff took hold of the brake-chain did he at the same time discover that the handhold was not on the car? A. Yes, at the same time.

"(10) Q. When plaintiff pulled the brake-chain had he looked to see whether or not the handhold was on the car? A. Yes, at the same time.

"(11) Q. Did plaintiff lose his balance when he pulled on the brake-chain? A. No, previous to that time.

"(12) Q. When plaintiff lost his balance, did he struggle to protect himself from falling in front of the car? A. Yes.

"(13) Q. Did plaintiff fall in front of the car while struggling to protect himself from such fall after he had pulled the brake-chain? A. Yes."

A motion for judgment for the defendant on the findings was denied, as was a motion for a new trial. The company assigns error upon these rulings; also upon the refusal of the court to give the following instruction:

"The jury are instructed that, in order to justify a finding in this case against the defendant that it was negligence to omit having a handhold in the usual place on the end of the car when plaintiff attempted to stop said car, it must appear from the evidence to the satisfaction of the jury: (a) That it was bound to anticipate that its trainmen would seek to stop such a car by the use of the means adopted by the plaintiff in this case. (b) And that it was necessary that a handhold be provided in the usual place on the end of the car in order to protect such employee from injury while attempting to stop the car by such means. (c) And that it would be dangerous to attempt to stop the car by the use of such means without such handhold or some equivalent device being provided at the usual place of such handhold on the end of the car where such attempt might be expected to be made. (d) And that defendant failed to provide such handhold or any other device which could with reasonable safety be used for the purpose of protecting such employee from injury while attempting to stop the car by the use of the means adopted by the plaintiff in this case, as shown by the evidence."

L. F. Parker, W. F. Evans, and H. C. Sluss, for plaintiff in error.

Houston & Brooks, for defendant in error.

The opinion of the court was delivered by

BENSON, J.: The first error specified by the defendant company is in refusing the instruction requested and previously quoted. The instruction, if given, would have limited the province of the jury in determining the question of negligence to a situation where the company would be bound to anticipate just such an accident, occurring in the precise manner that this occurred. This rule, if adopted, would unduly restrict the functions of a jury. It may be conceded that the defect, in order to be the basis of an action, should be such that injuries therefrom might reasonably be anticipated; yet it is not necessary that the particular circumstances attending such injuries should be an-

ticipated. The unusual nature of the accident and the attending circumstances are factors to be considered by the jury in determining the master's exercise of due care. (1 Lab. Mast. & Ser. § 145.) The instructions given were clear and comprehensive, and fairly presented the issues to the jury in the light of all the evidence, and no error is presented in the refusal to charge further, as requested.

It is urged that judgment for the defendant should have been rendered upon the findings. It is argued that the first five findings, taken in connection with the admissions of the plaintiff in his testimony, would support such a judgment. It is stated that the plaintiff ran in front of the car without looking to see whether there was a brake or handhold upon it or not, and that he negligently went so close to the car that he could not get away without injury, or that he negligently failed to attempt to get away. A careful reading of the evidence in connection with the findings leads to the conclusion, however, that the findings have their warrant and support in the evidence, although the evidence is conflicting.

The principal reliance of the defendant in asking for a reversal seems to be the alleged error of the court in refusing a new trial. It is claimed that the plaintiff failed to show any negligence of the company, and, upon all the evidence, that contributory negligence on his part was shown. Attention is called to the fact that the absence of a handhold does not prove negligence, because there was no evidence as to the time when it had been removed, and the rule announced in *Railway Co. v. Dorr*, 73 Kan. 486, 85 Pac. 533, that unless the defects were of such a nature, or had existed for so long a time that they should have been discovered and remedied, applies. In this case, however, if the theory of the plaintiff was sustained by the evidence, the employee was suddenly called to a place of danger by the order of his superior. In such a situation the master is presumed to know

whether the place or instrumentality is reasonably safe, and the servant may rely upon that assumption, unless the danger is so obvious that a prudent man in the same circumstances would not encounter it, even with the assurance that such presumption affords. The servant acting in good faith upon an order of his superior may rely upon the instrumentalities being in their usual condition and fit for use, where he does not have knowledge and is not chargeable with notice to the contrary. In such a situation he may rightly rely upon the assumption that his employer has done his duty by furnishing reasonably safe machinery, appliances and surroundings. (4 Thomp. Com. Law of Neg. § 3765; *Mo. Pac. Rly. Co. v. Barber,* 44 Kan. 612, 24 Pac. 969.) The order is considered to be an implied assurance that there is no abnormal danger. (1 Lab. Mast. & Ser. § 440c.)

Whether the plaintiff was negligent in the performance of the duty assigned to him must be determined in the light of the situation in which he was placed. If his act was such as a reasonably prudent man would have done, it was not negligent, although some other course would have been absolutely safe. (*Brinkmeier v. Railway Co.,* 69 Kan. 738, 77 Pac. 586.) It must be remembered that this was a sudden call to a dangerous service, which had to be performed then or not at all. Plaintiff was bound to use the discretion and judgment that a prudent man would in that situation. If it was a palpably reckless or foolhardy risk, he cannot be excused. If it was such as a prudent man would have performed, he might undertake it, although hazardous. The same rule applies to the manner in which the service was performed; called to the service, he was bound to use such means as reasonable prudence dictated in the emergency in which he was placed. Whether he ought to have undertaken the work, and whether he made use of reasonable means in performing it, were questions properly submitted to the jury.

In volume 1 of Labatt on Master and Servant, in section 358, it is said:

"In other cases the essence of the situation to be considered is that the servant was confronted by a serious danger; that he had not sufficient time to deliberate upon the comparative safety to the alternative courses of action open to him for the purpose of avoiding injury; and that the alarm or nervous excitement produced by the conjuncture impaired his reasoning faculties to such a degree that it was unjust to gage the quality of his conduct by the ordinary standards. It is well settled that a servant who is suddenly exposed to great and imminent danger is not expected to act with that degree of prudence which would otherwise be obligatory. Or, as the doctrine is also expressed, a servant is not necessarily chargeable with negligence because he failed to select the best means of escape in an emergency."

Where a conductor ordered a brakeman to cut off cars from a moving train it was held that, even if he was not directed to go in between the cars, he might nevertheless do so, if such a mode appeared to him, in the exercise of ordinary care, to be necessary. (*Hannah v. Connecticut River Railroad,* 154 Mass. 529, 28 N. E. 682.) The same rule was applied when on a dark, stormy night a brakeman, who was required to act promptly, complied with an order to use a defective link. (*Denver, T. & G. R. Co. v. Simpson,* 16 Colo. 55, 26 Pac. 339, 25 Am. St. Rep. 242.) In *Wurtenberger v. Railway Co.,* 68 Kan. 642, 75 Pac. 1049, it was held:

"Where a master orders a servant into a situation of danger, and, in obeying the command, he is injured, the law will not charge him with contributory negligence or with an assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under orders from one having authority over him." (Syllabus.)

In *Railroad Co. v. Langley,* 70 Kan. 453, 78 Pac. 858, it was said:

"Again, where one, by the negligent act of another,

is placed in a position of danger which requires immediate and rapid action, without time to deliberate as to the better course to pursue, he is not held to the strict accountability that is required of one situated in more favorable circumstances. Contributory negligence is not necessarily chargeable to one who fails to exercise the greatest prudence, or best judgment, in a case where he is required to act suddenly or in an emergency." (Page 461.)

The following cases are illustrative of the duties of a railroad company and its employees in similar cases: *Settle v. St. L. & S. F. R'y Co.,* 127 Mo. 336, 30 S. W. 125, 48 Am. St. Rep. 633; *Fox v. C., St. P. & K. C. R'y Co.,* 86 Iowa, 368, 53 N. W. 259, 17 L. R. A. 289; *Mason v. Railroad Co.,* 111 N. C. 482, 16 S. E. 698, 18 L. R. A. 845, 32 Am. St. Rep. 814; *Coates v. Boston & Maine Railroad,* 153 Mass. 297, 26 N. E. 864, 10 L. R. A. 769.

The company by its rule required the plaintiff to unite with other employees to protect its property. He was suddenly called to that duty by his superior. He was not only bound to use ordinary care but he was also bound to make all reasonable effort to save his employer's property. He was required to be loyal as well as to be careful. The facts were fairly submitted to a jury, and, finding no error in the proceedings, the judgment is affirmed.