No. 48,091

DANIEL J. BORTH, *Appellee,* v. CLARK BORTH, *Appellant.*

(561 P. 2d 408)

Opinion filed March 5, 1977.

*Raymond L. Dahlberg,* of Turner and Hensley, Chartered, of Great Bend, argued the cause, and *Lee Turner,* of the same firm, was with him on the brief for the appellant.

*Jack O. Bowker,* of MacDonald & Bowker, of McPherson, argued the cause, and *Tyrus C. Kaufman,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is a civil action for damages based upon a claim of personal injuries sustained by the plaintiff when he was charged and struck by a cow belonging to the defendant. The jury returned a verdict for the plaintiff for $9,500. The trial court overruled motions for a new trial and for judgment notwithstanding the verdict. Defendant appeals, claiming numerous trial errors.

The defendant, Clark Borth, is an adult son of the plaintiff, Dan Borth. Clark raises Charolais cattle. On January 26, 1971, Clark was vaccinating, castrating and dehorning cattle. He employed Larry Myers, Cecil Brookshire, Steve Kruse, Wayne Lundstrom, and the plaintiff to help him. About 50 head of cattle were placed in a large holding pen or corral. The cattle were herded singly from the corral into a long chute, at the far end of which was a "squeeze chute" where each animal was held while it was being treated. Myers, Brookshire, Kruse and plaintiff were in the pen where they kept the cattle moving and caused them to enter the chute as needed. Wayne Lundstrom was helping on the chute. The defendant and a veterinarian, Dr. V. D. Lundstrom, were up at the squeeze chute where they worked on each animal. The activity was carried on without incident until it came to the last cow in the corral. Suddenly and without warning, the animal turned and charged toward the plaintiff. The other men in the corral climbed over the fence and escaped; the cow struck the plaintiff in the lower back and threw him over the fence, causing him to sustain serious injuries.

## THE INSURANCE ISSUE

Defendant contends that the trial court should have declared a mistrial because (a) plaintiff's counsel mentioned insurance during *voir dire,* and (b) an unresponsive answer of the plaintiff during cross-examination indicated to the jury that the defendant had insurance. Defendant claims that this indication of insurance coverage was not inadvertent and "poisoned" the jury. Defendant also contends that the trial court erred in failing to grant defendant's motion for a new trial because of misconduct on the part of the jury in discussing insurance during its deliberations.

During *voir dire* a side-bar conference was held, in the course of which counsel for the plaintiff mentioned insurance. Defendant

moved for a mistrial and contended that the jury could have heard the discussion. The trial judge denied the motion. After the verdict was returned, the trial judge asked the jurors if any of them heard the remarks of counsel during the side-bar conference. He asked any juror who had heard the remarks to raise his hand; none responded. The court concluded that the jurors had not heard the remarks of counsel.

As would be anticipated, the plaintiff was cross-examined vigorously. During recross-examination he testified that since the accident, he had been studying how cattle should be handled and he stated that he had observed that there are a lot better ways. The following exchange took place:

"Q. And that is in connection with this building and establishing this $250,000 lawsuit for which you ask this jury to give a judgment against your son over there in the sum and amount of $250,000, is that correct?

"A. I fed my son for twenty-one years and he married and he went out on his own. He has been married for ten or twelve years. He has got his own business now in British Columbia and this won't cost him one red cent."

Counsel for the defendant moved that the jury be instructed to disregard the comment, "this won't cost him one red cent," and the court promptly so instructed the jury.

At the presentation of the motion for new trial, a number of jurors were called as witnesses. Some said that during deliberations insurance was merely mentioned; some said it was discussed; one said that it was discussed at length; another said it was idle speculation and "as far as we knew, there wasn't any insurance."

The remarks made during the side-bar conference would appear to be similar to those in *McGlothlin v. Wiles*, 207 Kan. 718, 725, 487 P. 2d 533. We there held that a reference to insurance made by plaintiff's counsel at a side-bar conference out of the hearing of the jury was not prejudicial. The trial court here found that the jury did not hear the statement made by counsel at the bench conference, and that finding is amply supported by the record.

It is the established law in this state that the deliberate injection of liability insurance coverage by the plaintiff into a negligence lawsuit is inherently prejudicial and is grounds for mistrial. *State Farm Fire & Casualty Co. v. Hornback*, 217 Kan. 17, 22, 535 P. 2d 441; *Alcaraz v. Welch*, 205 Kan. 163, 166, 468 P. 2d 185. However, where the mention of insurance during a trial is purely inadvertent and is not brought into the case by intentional misconduct, prejudicial error does not result. *Langley v. Byron Stout Pontiac, Inc.*, 208 Kan. 199, 491 P. 2d 891; *Bott v. Wendler*, 203 Kan. 212, 453 P. 2d 100.

We cannot say from the record before us that there was any intentional, deliberate injection of insurance into the evidence in this case. Just the opposite is shown. The remark by plaintiff, on recross-examination, was not a patent reference to insurance and appears inadvertent, not planned. The court's prompt admonition to the jury cured any possible prejudice. The size of the verdict, $9,500, is modest compared to the actual damages of over $20,000 claimed, and the total recovery of $250,000 sought. The mention of insurance by the jurors during deliberation does not appear to have been suggested by the evidence, nor does it appear that such conduct prejudiced the defendant or deprived him of his right to a fair trial. *Pike v. Roe,* 213 Kan. 389, 516 P. 2d 972. Under the circumstances we conclude that no prejudice has been shown, and the trial court properly overruled the motions for a mistrial and for a new trial.

## THE CLOSING ARGUMENT

Defendant contends that the trial court erred in failing to declare a mistrial or grant a new trial because of prejudicial remarks made by plaintiff's counsel during closing argument. The gist of this claim is that it was error for the court to permit plaintiff's counsel to comment on the failure of the defendant, who was present throughout the proceedings, to testify. Counsel commented upon this in both closing arguments.

The plaintiff relies upon *Skelly Oil Co. v. Urban Renewal Agency,* 211 Kan. 804, 508 P. 2d 954, where we held that a party is not obligated to call every witness he has listed, and, where a witness is equally available to both parties, no prejudicial inference arises from the failure of one party to call him. Our ruling in *Skelly* applies only to *witnesses,* not parties. We recently dealt with comment on the failure of a *party* to testify in *Spraker v. Lankin,* 218 Kan. 609, 616, 545 P. 2d 352. We held that opposing counsel may properly comment on the failure of a *party* litigant to testify, where the party is present throughout the trial. A *party* who is mentally and physically able to do so would ordinarily be expected to attend the trial of an action in which he is personally interested, and to testify on his own behalf as to facts in issue of which he has personal knowledge. Failure of a party to attend trial or to testify, where such party has the opportunity to do so, may properly be commented upon by opposing counsel. 88 C. J. S., Trial § 186; 75 Am. Jur. 2d, Trial § 235. We find no error in the court's rulings upon the motions.

## EXPERT TESTIMONY

Defendant contends that it was error for the trial court to permit Mike Borth, a younger son of the plaintiff, to testify as an expert witness. The witness testified without objection on direct examination as to how cattle were handled when he was living at home with his father, and he testified as to instruction he received and the practices followed in FFA work. He repeated much of this testimony on cross-examination, again without objection. On redirect examination he was again questioned as to the safety instruction he received in his FFA work, and at that point objection was made on the basis that the testimony would not establish what ordinary, prudent, experienced cattle people do in the county where the accident occurred. The witness was then permitted to testify that in FFA, he was taught to use panels for moving cattle and that the panels prevented the animals from charging or knocking you over. He later testified that he did not know whether it was possible to use panels "in a real live situation where people are doing it as a part of their living" because he had no such experience.

Objection was also made on the basis that the witness was not an expert when, on the second redirect examination, he was asked to explain "what knowledge a person obtains in working with or owning a herd of cattle." The objection was overruled and the witness responded that you learn the mean ones and you learn the tame ones; you see which ones are a little meaner. The evidence indicates that the witness raised livestock as FFA projects and worked with his father on the family farm. His father had milk cows and Herefords, and had from five to thirty head.

In *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 431 P. 2d 518, we said:

". . . There is no rule requiring that the expert have a special knowledge of every aspect of this field. The test of competency of an expert witness is whether he discloses sufficient knowledge of his subject to entitle his opinion to go to the jury. (K. S. A. 60-419, 60-456.) Where an expert witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of degree of his knowledge goes more to the weight of the evidence than to admissibility. . . ." (pp. 548, 549.)

The trial court has discretion to determine the qualifications of a witness to testify as an expert and to determine the admissibility of the testimony. To reverse the trial court, an abuse of discretion must be found. *State v. McClain*, 216 Kan. 602, 606, 533 P. 2d 1277. Under the circumstances we conclude that the trial court did not

err in admitting the testimony; the question of the weight to be accorded to the testimony was for the jury to determine.

## ASSUMPTION OF RISK

Finally, the defendant contends that the trial court erred in failing to direct a verdict and in failing to enter judgment for the defendant notwithstanding the verdict on the basis that the evidence and the reasonable inferences created by it, when viewed in a light most favorable to the plaintiff, showed as a matter of law that plaintiff was guilty of assumption of risk and/or contributory negligence which was a proximate cause of his injuries.

The doctrine of assumption of risk is still viable in Kansas though its application is limited to cases such as this where a master-servant relationship is involved. *Smith v. Blakey, Administrator,* 213 Kan. 91, 101, 515 P. 2d 1062. We turn first to our recent decisions in master-servant cases involving the doctrine. *Mechtley v. Price,* 217 Kan. 344, 536 P. 2d 1385, was an action by a farm employee against his employers to recover for personal injuries when an unshod horse he was riding stumbled and fell. We there said:

". . . Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee (*Blackmore v. Auer,* 187 Kan. 434, 357 P. 2d 765). Assumption of risk generally bars recovery by an employee who knows of the danger in a situation but nevertheless voluntarily exposes himself to that danger. In *Kleppe v. Prawl,* 181 Kan. 590, 313 P. 2d 227, 63 A. L. R. 2d 175, we said:

"'. . . [A]ssumption of risk arises through implied contract of assuming the risk of a known danger; the essence of it is venturousness; it implies intentional exposure to a known danger; it embraces a mental state of willingness; it pertains to the preliminary conduct of getting into a dangerous employment or relation; it means voluntarily incurring the risk of an accident, which may not occur, and which the person assuming the risk may be careful to avoid; it defeats recovery because it is a previous abandonment of the right to complain if an accident occurs.' (p. 594.)

"It should be noted the knowledge and appreciation of the risk involved is to be judged by a subjective standard, by knowledge attributable to the individual plaintiff and his situation (Prosser, Law of Torts, 4th ed., 1971, § 68, p. 447)." (p. 348.)

However, we should note that Prosser goes on to say that:

". . . [A] purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element

enters the case, and the standard applied in fact does not differ greatly from that of the reasonable man. The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him. . . ." Prosser, Law of Torts, 4th ed., 1971, § 68, p. 448.

*Uhlrig v. Shortt,* 194 Kan. 68, 397 P. 2d 321, was an action by a farm hand against his employer to recover damages for the loss of an eye. The injury occurred while the parties were filling a silo. We said:

". . . The employer is not to be held liable for an injury to an employee simply because of danger which was inherent in the employment, whether in the place of employment or the cause of the danger inherent in the tools, machinery or appliances with which the work must be performed. A master is not an insurer against injuries which his servants may incur in the discharge of their duties. . . .

There can be no liability on the part of the employer where it appears that the employee's knowledge of the danger was equal to or surpassed that of the employer. . . .

". . . Generally an employer will not be held liable if he . . . conducts his business in a manner conforming to the usage of others engaged in the same business under similar circumstances. See, e. g., . . . *Blackmore v. Auer,* 187 Kan. 434, 442, 357 P. 2d 765.

. . . . . . . . . . . .

"Many of the rules just announced are no doubt a result of the application of the doctrine of assumption of risk. In 35 Am. Jur., Master and Servant, § 299, pp. 722, 723, in considering the risk assumed, the rule is stated thus:

" 'The injuries for which an employee is barred from recovery by virtue of the doctrine of assumption of risk include but, according to the general accepted statement, do not extend beyond those which result from the "ordinary" risks of the employment or such as are "incident" thereto. An assumption of risk merely by virtue of the contract of employment embraces such perils, hazards, and dangers as are ordinarily and normally incident to or a part of the employment in question and of which the employee has knowledge, actual or implied, or of which it may be said that he is presumed to know. Under the head of "ordinary risks" are classed all those dangers or perils ordinarily incident to the conduct of the particular business in which the employee engages—those which exist after the employer has done everything that he is bound to do for the purpose of securing the safety of his employees. The term includes not merely those dangers which are obvious and open, but also those risks which, while not visible, are nevertheless a natural incident of the employment. The employee does not, however, merely by accepting employment, assume the risks which are not usually and ordinarily incident to that employment. As thus restricted, the doctrine rests on the thought that the employee, upon entering the employment of the master, assumes all the risks that are ordinarily and usually incident to the service upon which he enters, and if he is injured solely by reason of these perils he is not entitled to recover. . . .'

"The doctrine of assumption of risk rests for its support upon the express or implied agreement of the employee that, knowing the danger to which he is

exposed, he agrees to assume all responsibility for injuries resulting from his employment. This court has stated that to raise an implied agreement the risk assumed must be known to the employee, or it must be of such a nature as, by the exercise of reasonable observation and caution for his own safety, he should have known it. One, knowing all the danger and peril of pursuing a given course and being under no compulsion to encounter the same, who freely and voluntarily continues therein, cannot recover damages for injuries he may suffer. . . ." (pp. 71-73.)

In *Blackmore v. Auer*, 187 Kan. 434, 357 P. 2d 765, where a farm laborer was injured while loading baled hay, we said:

"The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. *Lively v. Railway Co.*, 115 Kan. 784, 225 Pac. 103, and authorities cited therein." (pp. 444, 445.)

Mike Borth testified that the plaintiff is not an expert in working around and handling cattle. He acknowledged, however, that his father has worked with and handled cattle most of his life. Mike said that he learned in FFA that when you are separating cattle out and you end up with most of the cattle being somewhere else and one or two animals left, the remaining ones get very nervous and excited. If an animal gets excited, it may charge you or do something else. In his opinion, everyone that knows anything about cattle should know that, and should take proper precautions to avoid getting hurt by such an animal.

Wayne Lundstrom testified that every one of the men that were there that day was an experienced cattleman. He said that in his opinion any cattleman knows that when you get down to one or two animals left in the big pen and the others have been moved through, you had better watch those animals because they are very nervous and may try anything.

Steve Kruse is another farmer and cattleman who was present. He testified that Charolais cattle may or may not require special handling; in every breed of cattle there are jumpy ones. An experienced cattleman knows that when you begin to get down to where there are only a few cattle left in the pen, that is when they get the most excitable. When you are left with only one animal in the pen that animal might do anything at any time. It can charge a man or a horse, or go through a fence. In his opinion any man with experience working with cattle knows this can happen.

Larry Myers is a 35-year-old farmer-stockman. He testified

that in his opinion any man who has worked around cattle knows that when you end up with only one or two animals in the holding pen, those cattle get nervous and may try to take you or go over the fence.

Dr. V. D. Lundstrom has been in McPherson County for twenty-four years and has worked with Dan on numerous occasions. He has worked on Dan's cattle, performing routine procedures, castrating and dehorning; he considers Dan Borth a knowledgeable, experienced cattleman. When you are separating cattle, the last animal or few animals are going to be the most unruly of all. Everybody who works around cattle knows this. A few minutes before the accident happened, the animal that charged Dan was identified by someone as an unruly animal. He heard someone say "watch out for him." The witness saw that the animal tended to be unruly. From that time on, an experienced cattleman should have been on guard for his own safety.

Dan Borth testified that he was 64 years of age and always had a few cattle on the farm, sometimes only four, and after he got into Herefords, perhaps thirty at the most. Clark never indicated that any of his cattle were wild or skittish or dangerous; he always boasted about his cattle being docile and like pets. Clark told Dan "to keep moving them around so they don't get nervous and break down the fence on one side or the other." At the time the accident occurred there was just one animal left in the pen. Dan had not heard anyone warn that the animal was dangerous. As he was watching the cows, someone hollered, "Look out, Dan, she is getting you." He saw the cow put her head down to the ground and charge. He turned and ran toward the fence but the cow hit him in the lower back, knocking him over the fence. He knew that it was necessary to keep his eyes on the cattle because there can always be bad ones in any herd, and they might do something unexpected. Dan stated that he did not have extensive knowledge and experience in handling all kinds of cattle. Though he had worked around cattle most of his life, he had not worked in a holding pen before. He knew of the hazards of working in a cattle operation of this type. He knew that when you work with cattle in close quarters they can get dangerous and cause injuries. He knew that when you are separating animals they can act up and do unpredictable things. Clark did not have to tell him that a cow separated out from a herd can act up and do unpredictable things that may result in injury. The year before the accident he

helped herd cattle into a corral or a round circle fence and then into a squeeze chute on Clark's place. He did the same thing that was being done the day of the accident. Dan's job the year before was similar to what was being done the day of the accident.

The record is abundantly clear that Dan Borth has had a lifetime of experience working around cattle. He has owned, handled, and cared for them. He has previously done the same type of work that he was doing at the time of injury. He knew of the risk he was taking in the cattle pen, and he knew that a particular risk arose when but one animal remained in the pen, after the others had been separated out.

He could have refused to work under the attendant conditions, or he could have secured and used a metal or wood panel for his protection. He did neither. He knew what the facilities were when he went to Clark's place on the day of the accident, having been there perhaps three times before.

The evidence is undisputed that the facilities at Clark Borth's farm were average for the community, and that they were fit for the purposes for which they were being used. The operation was being carried on in a way familiar to cattlemen of the area and, as one stated, it "is what the ordinary, reasonable and prudent cattleman does." The risk of injury by the cattle is clearly one that arises out of the activity being carried on, and one that is open and apparent. While the *extent* of the injuries sustained by plaintiff is regrettable, and no doubt greater than is usual, it cannot be said that the *type* of injury is unusual. It is a type of injury ordinarily and normally incident to the employment. There was an obvious risk of harm to the men working in the corral.

Dan Borth, with his years of experience owning and handling livestock, had actual knowledge of the risk and appreciated its magnitude. He voluntarily chose to remain within the area of the risk, and thus manifested his willingness to accept the risk. Defendant's protestations of inexperience notwithstanding, the record compels these conclusions, particularly in light of the admissions of the plaintiff. Admissions made by a party are the strongest kind of evidence. *Hallet v. Stone,* 216 Kan. 568, 575, 534 P. 2d 232.

We hold that Dan Borth assumed the risk of his employment as a matter of law. The trial court therefore erred in failing to sustain defendant's motion for a directed verdict, and for judgment notwithstanding the verdict.

The judgment is reversed with directions to enter judgment for the defendant.

Owsley, J., dissenting: I cannot agree with the portion of the majority opinion which holds that the plaintiff is precluded from recovery for his damages because he assumed the risk of injury as a matter of law. In *Railroad Co. v. Morris*, 76 Kan. 836, 93 Pac. 153, this court established the rule which has been frequently quoted in master and servant cases, stating:

"Where a master orders a servant into a situation of danger, and in obeying the command the servant is injured, he will not be charged with contributory negligence, or with an assumption of the risk, unless the danger was so glaring that no prudent man would have encountered it, even under such orders, provided he acts with reasonable prudence in executing such orders." (Syl. 2.)

Defendant ordered plaintiff to "go in there [the pen] and keep them milling around. Never stop. Just keep them moving." Thus plaintiff should not be charged with assumption of risk unless the danger he faced was "so glaring that no prudent man would have encountered it." While the evidence indicated plaintiff had been around cattle most of his life, it also revealed he had never worked cattle in a holding pen. Furthermore, he had been told by defendant and defendant's wife that their cattle were docile and like pets. The animals, to plaintiff's observation, had never demonstrated any skittishness or hostility until the cow charged plaintiff and threw him over the fence. It wasn't until after the accident that he learned Charolais cattle were generally more skittish than other livestock. These factors, coupled with the fact two other men went into the pen with plaintiff to move the cattle, create an issue which should be resolved by a jury.