No. 67,445

James A. Tuley and Angela Hatfield, *Appellants,* v.
Kansas City Power & Light Company, *Appellee.*

(843 P.2d 248)

Opinion filed December 11, 1992.

*Shawn E. DeGraff*, of Robert G. Herndon, P.A., of Overland Park, argued the cause, and *Robert G. Herndon*, of the same firm, and *Ernest C. Ballweg*, of Johnston, Ballweg, Christlieb & Tuley, of Overland Park, were with him on the briefs for appellants.

*J. Nick Badgerow*, of Spencer, Fane, Britt & Browne, of Overland Park, argued the cause, and *Michael A. Rump*, of Kansas City Power and Light Company, of Kansas City, Missouri, was with him on the brief for appellee.

*F. James Robinson, Jr.*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

ABBOTT, J.: This is an appeal from the trial court's grant of summary judgment in favor of Kansas City Power & Light Company (KCPL). This is a class action negligence suit on behalf of current and former employees of KCPL, alleging property damage to their vehicles because of exposure to acidic particulate emissions (acid rain) from the plant. The plaintiffs also appeal from the trial court's denial of class certification to the plaintiffs' spouses.

KCPL is a public utility that owns and operates the LaCygne Generating Station, a two-unit coal-fired electric generation facility located near LaCygne, Kansas, in Linn County.

To generate electric energy, both units at the LaCygne plant burn coal as fuel. To remove a percentage of the particulates, including fly ash, sulphur dioxide ($SO_2$), and sulphur trioxide ($SO_3$), from the combustion gases emitted from the boiler and discharged into the stack, Unit No. 1 employs a limestone wet slurry scrubber, which uses a mixture of water and ground limestone. Unit No. 2 employs an electrostatic precipitator to remove a percentage of the particulates (fly ash) from the combustion gases emitted from the boiler and discharged into the stack. No pollution control equipment is used to remove sulphur compounds from the combustion gases in Unit No. 2 because a better grade of coal with a low sulphur content was burned. Unit No. 1 burns a lower grade of coal and has design features and prob-

lems unique to it. When combined with water, $SO_2$ forms sulphurous acid and $SO_3$ forms sulphuric acid. These acids corrode the exterior surfaces of vehicles.

The substances emitted from the stacks of the two units are governed by federal and state air quality control laws. Congress enacted the Clean Air Act to regulate and control air pollution. The Act enables the Environmental Protection Agency (EPA) to identify air pollutants posing a hazard to public health and welfare and to promulgate the National Ambient Air Quality Standards (NAAQS) for those pollutants. Such a standard has been promulgated for $SO_2$. To comply with the NAAQS, Kansas has developed a State Implementation Plan (SIP), which the EPA has approved. K.A.R. 28-19-31(C), part of the Kansas SIP, provides:

"A person responsible for operation of any indirect heating equipment having a heat input of 250 million BTU/hr or greater shall not cause or permit the emission or more than 1.5 pounds of sulfur per million BTU of heat input per hour."

Both parties agree this regulation governs the emissions from Unit No. 1, which has indirect heating equipment with a heat input of 250 million BTU/hr or greater.

In August 1977, KCPL hired Burns & McDonnell to conduct emissions tests. Burns & McDonnell reported that Unit No. 1 was emitting less than the legal limit, which is three pounds of $SO_2$ per million BTU. The record is not clear how the "1.5 pounds of sulfur per million BTU of heat input per hour" language of K.A.R. 28-19-31(C) translates into the "three pounds of $SO_2$ per million BTU" that the parties agree is the legal limit.

In 1987, Burns & McDonnell again conducted emissions tests at the request of KCPL. On June 24, 1987, the tests performed reflected $SO_2$ emissions of 3.12, 3.71, 3.65, and 5.68 pounds per million BTUs. The average test run was 3.49. In December 1987, two of the seven tests performed were under the three-pound limit, reflecting $SO_2$ emissions of 2.98 and 2.89 pounds per million BTU. The other five tests performed were above the three-pound limit. KCPL did not inform employees of any of the 1987 test results.

In December 1975, at the LaCygne Generating Station, KCPL posted written notices disclaiming responsibility for damage to vehicles.

The notice read:

"NOTICE TO ALL EMPLOYEES OF KANSAS CITY POWER & LIGHT COMPANY . . . .

Within the past several weeks, Kansas City Power & Light Company has received numerous damage claims by insurance companies which have paid losses to their insureds for damage to motor vehicle finishes allegedly the result of stack emissions. These claims have all been denied by the Company due to the fact that stack emissions are a normal result of day-to-day operations and are not the result of any negligent activity by the Company or its employees.

PLEASE BE ADVISED THAT THE COMPANY WILL CONTINUE TO DENY THESE TYPES OF CLAIMS, AND THAT PARKING YOUR MOTOR VEHICLE AT OR NEAR THE PLANT SITE IS AT YOUR RISK."

James A. Tuley, who filed the original petition, denied ever seeing or being aware of this notice.

In February 1976, KCPL erected a permanent outdoor sign that reads as follows:

"NOTICE TO PARKING LOT USERS - AIRBORNE MATERIALS FROM CONSTRUCTION ACTIVITIES AND FROM INTERMITTENT STACK EMISSIONS MAY CAUSE DAMAGE TO VEHICLES - USE OF THIS LOT IS AT YOUR OWN RISK."

The sign is eight by four feet with the top of the sign eight feet above the ground. The sign is located 1,136 feet from the main gate and 851 feet from the entrance to the parking shelter. Tuley and Angela Hatfield, the plaintiffs representing the class, admitted to reading the sign and being aware of its warning.

Beginning in 1978, KCPL constructed four separate covered parking lots to provide parking for its employees. After these four lots were constructed, there were no major incidents involving paint damage to employees' vehicles parked at the LaCygne plant until 1987. That does not mean there was no damage. The record shows there was damage to at least some vehicles. In fact, Tuley testified he had been an employee of KCPL for 18 years and that "[e]very vehicle [he has] ever owned and driven in the power plant has been damaged."

From December 1987 to February 1988, Unit No. 1 operated with severe problems. The unit's steam generator and AQC system were designed to burn coal containing a higher thermal content and a significantly lower ash and sulphur content than the coal actually burned from 1987 to 1989. The change in coal

quality had a negative effect on the performance of the unit's steam generator and AQC system. The type of emissions released by a unit depends upon the quality of the coal burned. In 1977, because of historically poor coal quality, KCPL had agreed to adjust the contract with the coal supplier and accept coal with a lower thermal content and a higher ash content. By or before the spring of 1988, KCPL concluded Unit No. 1 could not comply with the air quality control regulation on $SO_2$ emissions because of the type of coal being burned in the unit. KCPL did not inform the plaintiffs that it was in violation of and could not comply with the applicable air quality control standards.

It is undisputed that the risk of particulate emission damage to employees' vehicles, which were parked in the parking lot KCPL provided, was increased because KCPL did not comply with the air quality control standards, particularly the regulation limiting $SO_2$ emissions. Because of the combination of factors set forth above, there was a sufficient quantity of moisture residue for the wind to carry the residue underneath the canopies covering the employee parking lot. The canopies range from 14 feet 4 inches to 18 feet above the surface level, a height that is higher than necessary to accommodate employee vehicles. The canopies' design did not consider horizontal wind reaction. As a result, the canopies are effective only if there is no wind.

In July 1989, Tuley filed a negligence action against KCPL, requesting that the trial court certify the action as a class action with KCPL employees composing the class members and alleging KCPL's negligence caused employee vehicles to be exposed to acid rain, that is, acidic particulate emissions from the plant. The petition was amended to include employees' spouses within the requested class. The trial court certified the action as a class action, but declined to include the spouses of employees within the class. KCPL filed a motion for summary judgment, alleging that the assumption of risk doctrine barred the plaintiffs' claims. The trial court granted this motion.

The plaintiffs appeal, arguing that the trial court erred in finding the assumption of risk doctrine barred the plaintiffs' claim and in denying class certification to the plaintiffs' spouses. The plaintiffs' motion, pursuant to K.S.A. 20-3017, to transfer the case from the Court of Appeals to this court was granted.

## I. Viability of Assumption of Risk Defense

The plaintiffs ask this court to abolish the defense of assumption of risk. In Kansas, the common-law assumption of risk doctrine is restricted to cases involving employer-employee relationships. *Smith v. Blakey, Administrator*, 213 Kan. 91, 101, 515 P.2d 1062 (1973). This case involves an employment relationship. Therefore, under *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984), KCPL could raise assumption of risk as a defense. The plaintiffs acknowledge the *Jackson* court held that comparative negligence principles do not abrogate the doctrine of assumption of risk. Nonetheless, the plaintiffs claim the issue warrants reconsideration because the rationale for retaining the doctrine is no longer persuasive in that it has outlived its utility and it defeats the purpose of comparative fault legislation. In order to consider the viability of the plaintiffs' claim, we first must review the *Jackson* decision.

The *Jackson* court held: "Within its very restricted periphery of application, the common law defense of assumption of risk has not been altered by the adoption of comparative fault, K.S.A. 60-258a, and continues to constitute an absolute bar to recovery." 235 Kan. 278, Syl. ¶ 6. In so holding, the court paid special attention to the fact that prior cases treated the doctrines of assumption of risk and contributory negligence as distinct concepts. The statutory comparative negligence scheme, enacted in 1974 and codified at K.S.A. 1991 Supp. 60-258a, only provides that contributory negligence is not a complete bar to recovery. The statute is silent concerning the effect of comparative negligence principles upon the doctrine of assumption of risk. Therefore, the *Jackson* court concluded the legislature did not intend 60-258a to apply to the doctrine of assumption of risk.

Additionally, the *Jackson* court noted that two years after the enactment of 60-258a, the legislature amended the affirmative defenses statute, now K.S.A. 1991 Supp. 60-208(c), but did not delete assumption of risk or injury by fellow servant from the list of affirmative defenses. Thus, it was concluded the legislature had the opportunity to abolish the assumption of risk defense, but did not do so, giving an indication it did not intend for the doctrine to be abolished. Based upon this analysis of legislative intent, we held assumption of risk applicable to employer-em-

ployee negligence cases not otherwise excluded, such as workers compensation cases.

It cannot be ignored that the legislature has had eight years since the *Jackson* decision to abrogate statutorily assumption of risk and has not done so. We are unwilling now to abolish the doctrine because the legislature has given no indication it desires to do so. Thus, we affirm syllabus ¶ 6 of *Jackson v. City of Kansas City*, 235 Kan. 278, which reads as follows:

"Within its very restricted periphery of application, the common law defense of assumption of risk has not been altered by the adoption of comparative fault, K.S.A. 60-258a, and continues to constitute an absolute bar to recovery."

## II. Plaintiffs' Property Damages Claim

Relying upon *Schoof v. Byrd*, 197 Kan. 38, 415 P.2d 384 (1966), the trial court found that the defense of assumption of risk applies to property damages. The *Schoof* court stated: "Under the doctrine of assumed risk, one who voluntarily exposes himself or his property to a known or appreciated danger *due to the negligence of another* may not recover [for] the injury sustained thereby." 197 Kan. at 52-53.

The plaintiffs contend the trial court erred in relying upon this statement in *Schoof* in that the statement was dictum because the damages claimed in *Schoof* were for personal injuries, not property damages. The plaintiffs, however, do not cite any authority from Kansas, other jurisdictions, or secondary sources to support their proposition that assumption of risk cannot be raised in a case involving only property damages.

KCPL cites three cases from other jurisdictions to refute the plaintiffs' proposition. See *Wilder v. DiPiazza*, 481 So. 2d 1091 (Ala. 1985); *Reckart v. Avra Valley Air, Inc.*, 19 Ariz. App. 538, 509 P.2d 231 (1973); *Commonwealth v. Millsaps*, 232 Va. 502, 352 S.E.2d 311 (1987). Although none of the cases cited involved an employer-employee relationship, assumption of risk was applied as a defense. *Millsaps* and *Reckart* involved only property damages. *Wilder* involved both property damages and personal injury. None of the courts expressly addressed the issue that is before this court. KCPL also directs this court's attention to a C.J.S. discussion in which the doctrine of assumption of risk is described as being applicable to both personal injury and property

damage. See 65A C.J.S., Negligence § 174(1), (4), pp. 289, 299; and see 57A Am. Jur. 2d, Negligence § 804. The general rule is that assumption of risk can be raised as a defense to a claim involving property damages. We are cited no valid reason why Kansas should not follow the general rule. Kansas has assumed that to be the law in this state as evidenced by *Schoof v. Byrd*.

According to the plaintiffs, the trial court also erred in deciding this issue as a matter of law. Again, without citing any authority, the plaintiffs argue it is a question of fact whether assumption of risk applies to property damages. The *Jackson* court restated that assumption of the usual risk of employment is a question of law, but a jury question can arise if the risks of employment are unusual. 235 Kan. at 294. The plaintiffs' proposition does not fit within the *Jackson* court's discussion concerning questions of law and fact. The trial court did not err in holding as a matter of law that assumption of risk applies to the property damages claimed in this case.

### III. Summary Judgment

The trial court granted KCPL's motion for summary judgment, in which KCPL had argued that the defense of assumption of risk barred the plaintiffs' claims and that KCPL had not violated its duty to provide a safe work place. The plaintiffs argue that the trial court erred in granting KCPL's motion.

The trial court listed the key elements in proving the defense of assumption of risk as "knowledge or appreciation of the danger of the risk, an employment agreement, and a voluntary assumption of that risk by acceptance or continuation of employment." Dean Prosser lists two requirements: "[T]he plaintiff must know and understand the risk he is incurring, and . . . his choice to incur it must be entirely free and voluntary." Prosser, Law of Torts § 68, p. 447 (4th ed. 1971). These requirements or elements will be referred to as "knowledge of risk" and "voluntary assumption."

The plaintiffs interpret *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984), to mean a defendant's negligence is an absolute bar to asserting a successful assumption of risk defense, based upon the following statements in *Jackson*:

"In *Miller v. Beech Aircraft Corporation*, 204 Kan. 184, 460 P.2d 535 (1969), this court noted the doctrine was not viable when the risks resulted from the master's negligence. 204 Kan. at 190." 235 Kan. at 294.

"In discussing the common law defense of fellow servant, which is a subspecies of assumption of risk, this court in *Taylor v. Hostetler*, 186 Kan. 788, 352 P.2d 1042 (1960), stated:

'For the master to claim exemption from liabilities for injuries to a servant on the ground that the negligent act was that of a fellow servant, the master must have exercised reasonable care to prevent the injury. The risk that the master may be negligent in performing his duty is not one that the servant assumes.' " 235 Kan. at 304.

"As shown by the cases heretofore cited the employer must, *in essence*, be negligence free as a condition to the successful assertion of the defense of assumption of risk. Therefore, when assumption of risk has been established there is no negligence to be compared between the employer and the injured employee." 235 Kan. at 305. (Emphasis added.)

The trial court acknowledged it was troubled by these statements, commenting:

"It has been the general rule that 'a servant generally assumes the risks attributable to his employer's negligence where he has knowledge of such risks or they are so patent and obvious that he should have known of their existence.' 56 C.J.S., Master and Servant, § 384, p. 1194. This general rule flows consistently throughout the Kansas case law regarding the assumption of risk doctrine excepting, arguably, only the decision of *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984)."

The trial court asserted that these statements were dicta; that this court had not intended for the statements to be taken as a "universal conclusion that whenever the defendant is negligent, the assumption of risk doctrine cannot apply"; that the cases the *Jackson* court relied upon did not support such a conclusion; and that to interpret *Jackson* as the plaintiffs suggest would require reversing a long line of cases.

KCPL contends it is illogical to require an employer to be free of negligence before the employer can raise assumption of risk as a defense. KCPL asks, "What need has the defendant for such a 'complete defense,' when his freedom from negligence is already a complete defense?"

The plaintiffs' interpretation of the language in *Jackson* is overbroad. This court did not intend the interpretation the plaintiffs place on the language. In *Jackson*, this court reviewed the general law of assumption of risk when we stated "in essence" and in

dicta made a sweeping generalization; that, if interpreted literally, is not a correct statement of law. The law governing an employer's negligence in assumption of risk cases is set forth in *Schoof v. Byrd*, 197 Kan. at 55:

" 'An employee cannot recover from an employer unless the employer has been guilty of negligence. The employer must have been guilty of some breach of duty which he owed to the servant. The employer is not to be held liable for an injury to an employee simply because of danger which was inherent in the employment, whether in the place of employment or the cause of the danger inherent in the tools, machinery or appliances with which the work must be performed. A master is not an insurer against injuries which his servants may incur in the discharge of their duties. See, *e.g., West v. Packing Co.*, 86 Kan. 890, 122 Pac. 1024; *Udey v. City of Winfield*, 97 Kan. 279, 155 Pac. 43; *Gentry v. Davis, Agent*, 115 Kan. 335, 222 Pac. 769, and *Hunter v. Barnsdall Refining Co.*, 126 Kan. 277, 268 Pac. 86.' "

Other applicable rules of law pertaining to this case are set forth in *Jackson* as follows:

"*Borth v. Borth*, 221 Kan. 494, 561 P.2d 408 (1977), contains a good summary of Kansas law on assumption of risk. Although decided after the introduction of comparative fault (1974), the cause of action arose prior thereto (1971). This court stated:

'The doctrine of assumption of risk is still viable in Kansas though its application is limited to cases such as this where a master-servant relationship is involved. *Smith v. Blakey, Administrator*, 213 Kan. 91, 101, 515 P.2d 1062. We turn first to our recent decisions in master-servant cases involving the doctrine. *Mechtley v. Price*, 217 Kan. 344, 536 P.2d 1385, was an action by a farm employee against his employers to recover for personal injuries when an unshod horse he was riding stumbled and fell. We there said:

" '. . . Assumption of risk, in the law of master and servant, is a phrase commonly used to describe a term or condition in the contract of employment, either express or implied from the circumstances of the employment, by which the employee agrees that certain dangers of injury, while he is engaged in the service for which he is hired, shall be at the risk of the employee (*Blackmore v. Auer*, 187 Kan. 434, 357 P.2d 765). Assumption of risk generally bars recovery by an employee who knows of the danger in a situation but nevertheless voluntarily exposes himself to that danger. In *Kleppe v. Prawl*, 181 Kan. 590, 313 P.2d 227, 63 A.L.R.2d 175, we said:

" ' ". . . [A]ssumption of risk arises through implied contract of assuming the risk of a known danger; the essence of it is venturousness; it implies intentional exposure to a known danger; it embraces a mental state of willingness; it pertains to the preliminary conduct of getting

into a dangerous employment or relation; it means voluntarily incurring the risk of an accident, which may not occur, and which the person assuming the risk may be careful to avoid; it defeats recovery because it is a previous abandonment of the right to complain if an accident occurs." ' (p. 594.)

" 'It should be noted the knowledge and appreciation of the risk involved is to be judged by a subjective standard, by knowledge attributable to the individual plaintiff and his situation (Prosser, Law of Torts, 4th ed., 1971, § 68, p. 447).' (p. 348.)

' "However, we should note that Prosser goes on to say that:

' ". . . [A] purely subjective standard opens a very wide door for the plaintiff who is willing to testify that he did not know or understand the risk; and there have been a good many cases in which the courts have said in effect that he is not to be believed, so that in effect something of an objective element enters the case, and the standard applied in fact does not differ greatly from that of the reasonable man. The plaintiff will not be heard to say that he did not comprehend a risk which must have been quite clear and obvious to him. . . ." Prosser, Law of Torts, 4th ed., 1971, § 68, p. 448.' " *Jackson,* 235 Kan. at 302-03.

" 'In *Blackmore v. Auer,* 187 Kan. 434, 357 P.2d 765, where a farm laborer was injured while loading baled hay, we said:

" ' "The assumption of the usual risks of an employment is not ordinarily a jury question. It is a matter of law. It is only where the risk is or may be unusual that a jury question can arise; and even in such cases, if the risk though unusual is obvious, such as an ordinarily prudent man could appreciate and understand, the workman who persists in the employment assumes the risk of it. *Lively v. Railway Co.,* 115 Kan. 784, 225 Pac. 103, and authorities cited therein." (pp. 444, 445.)' 221 Kan. at 499-501." *Jackson,* 235 Kan. at 304.

Here, KCPL had no duty to furnish parking to its employees. It did so, but placed a large sign in a conspicuous place warning of the risk and advising people they parked at their own risk. Anyone driving by the sign on a daily basis is presumed to have read the sign. The fact that employees on the morale committee worked with management to install covered parking leaves no room for doubt it was done to protect vehicles from acid rain.

Tuley's testimony was that the emissions had damaged every vehicle he had owned and driven to the plant for 18 years. Common sense tells one that a car parked in an open pasture setting, under a roof, open on four sides, will have whatever is in the air blown on it when the wind blows, and this is so whatever the height of the roof. Thus, the employees knew of

the risk and knew both of the potential harm and of the actual harm.

It is not knowledge of the actual facts that is determinative in applying assumption of risk; it is knowledge of the risk involved. Here, the risk was obvious and, although KCPL (for the purpose of a summary judgment motion) was negligent to some extent in allowing excessive omissions into the air, even then, the employees observed splotches of ash, etc., on their vehicles. The plaintiffs did not have knowledge of the act, or acts, of negligence concerning the emissions, but they did know, or should have known, of and appreciated the risk of parking their vehicles next to the plant.

With regard to the canopies, the trial court found "that the construction of the cover parking facilities subsequent to the erection of the warning sign might, at best, constitute an inducement to continue employment."

" '. . . [T]here is an exception to the general rule of the assumption of risk in those cases where an employee, after complaint has been made of a defective or dangerous condition, is induced to continue his service for a reasonable time by reason of his employer's promise to remedy the defect. [Citations.] The application of this exception presupposes that the employee has complained of the dangerous condition to his employer; that the employer has promised to remedy the dangerous condition; and that the employee has thereafter continued his service for a reasonable time in reliance upon the employer's promise.' [Citation omitted.]" *Mechtley v. Price*, 217 Kan. 344, 349, 536 P.2d 1385 (1975).

The trial court concluded that the record did not support the finding that KCPL had promised to remedy the situation or had induced the plaintiffs to continue employment for a reasonable time. The covered parking was installed in 1978. Thus, employees had an opportunity to gauge the roofs' effectiveness for some 10 years, and the record contains nothing that can be construed as a promise to remedy the situation or to do anything further.

The trial court found that assumption of risk can be raised as a defense even if the defendant's alleged negligence is based upon violation of a statute. We agree. See Prosser, Law of Torts § 68, p. 453 ("Where the defendant's negligence consists of the violation of a statute, the traditional view has been that the plaintiff may still assume the risk.").

The trial court did not err in granting summary judgment in favor of KCPL.

### IV. Members' Spouses

The trial court rejected the plaintiffs' argument that the class membership should include employees' spouses because the spouses owned an interest in the vehicles damaged by the acid rain. The court found "that the basis for this joinder, *i.e.,* ownership of an interest in the vehicle, opens the class to a number of persons and/or parties, including financial institutions, insurance companies, etc., whose participation in the class action is unnecessary, unmanageable, and inappropriate."

The standard of review is whether the trial court abused its discretion. See *Connolly v. Frobenius,* 2 Kan. App. 2d 18, Syl. ¶ 3, 574 P.2d 971, *rev. denied* 225 Kan. 843 (1978) ("The trial judge must be afforded substantial discretion in the decision-making process as to the maintenance of a class action."); *Steele v. Security Benefit Life Ins. Co.,* 226 Kan. 631, 638, 602 P.2d 1305 (1979). "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Soden,* 251 Kan. 225, Syl. ¶ 9, 834 P.2d 358 (1992).

The plaintiffs disagree with the trial court's rationale that joinder of spouses would open the class to financial institutions, insurance companies, etc. The plaintiffs contend such parties' interest in the vehicle would be triggered only upon some condition precedent, such as default, loss, payment, or subrogation. The plaintiffs maintain that joinder of spouses is necessary to avoid duplication of lawsuits and directs this court's attention to federal cases in which spouses were allowed to join the class of members.

KCPL responds that other federal cases have denied class membership to spouses. The defendant asserts the fact "[t]hat other courts in other cases presenting different facts and different claims reached a different decision does not render the trial court's decision an abuse of discretion." KCPL also points out that the plaintiffs attempted to join all spouses, regardless of whether the individual spouse had an ownership interest in the employee

vehicle. The defendant contends that each plaintiff adequately protects his or her membership in the class and can assert the interest of the joint tenant, if there is one.

The trial court's decision was not arbitrary, fanciful, or unreasonable. Furthermore, we cannot say no reasonable person would take the view adopted by the trial court. Thus, the trial court did not abuse its discretion, and this court will not disturb the trial court's ruling on appeal.

Affirmed.